**Claude Bernard ALLEN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–1247.

District of Columbia Court of Appeals.

Argued En Banc March 15, 1991.
Decided Feb. 28, 1992.

**1220**

Samia Fam, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Elizabeth Trosman, Steven W. Pelak, and Helen M. Bollwerk, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB and WAGNER, Associate Judges, and BELSON,* Senior Judge.

Opinion for the court by Associate Judge SCHWELB.

Concurring opinion by Chief Judge ROGERS, with whom Associate Judges FERREN and TERRY join, at p. 1229.

Concurring opinion by Associate Judge TERRY at p. 1239.

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. Allen claimed that he concealed his identity because he feared for his life as a result of

SCHWELB, Associate Judge:

Rejecting his claim of self-defense, a jury convicted Allen of manslaughter while armed and of carrying a pistol without a license. D.C.Code §§ 22–2405, –3202, –3204 (1989). A division of this court, with one judge dissenting, reversed his conviction, holding that the prosecutor's alleged use of missing evidence and missing witness inferences during cross-examination of the defendant, and thereafter in closing argument, was improper, that the prosecutor had shifted the burden of proof, and that Allen was thereby unfairly prejudiced. *Allen v. United States*, 579 A.2d 225 (D.C. 1990) (*Allen I*). The United States filed a petition for rehearing en banc and, on January 25, 1991, this court vacated the division opinion, *Allen II*, 584 A.2d 604 (D.C. 1991) (per curiam) (en banc), and the case was subsequently reheard by the full court. Finding no reversible error, we now affirm.

I

**THE EVIDENCE**

The facts are described in considerable detail in the majority and dissenting opinions in *Allen I, supra*, 579 A.2d at 226–28, 236–38, and we confine our exposition of them accordingly.

On November 13, 1983, Allen shot and killed Samuel Manning. The incident was apparently the culmination of a dispute over Manning's alleged misappropriation during the previous summer of Allen's car, and of some subsequent ramifications of that quarrel. Shortly thereafter, Allen fled to Florida, where he lived under an assumed name.[1] When he was apprehended in Miami almost two years after Manning's death, Allen told the FBI that his name was Anthony Jenkins and that he knew nothing about the killing of Manning. On the way back to Washington, D.C., he ad-

threats from Manning's associates. As noted in the text below, however, he also made false statements to law enforcement officials as to who he really was.

vised Detective Queen of the Metropolitan Police Department that "the guy you're looking for is in Washington, D.C." After being advised of his rights, however, he told Detective Queen that Manning had pulled a gun on him and that he shot back with a .38 caliber pistol.[2]

At trial, the prosecution presented evidence which, if credited, tended to show, among other things, that Allen had shot Manning, fled to Florida, concealed his identity, lied to the police as to who he was, and subsequently threatened a government witness. In response, Allen took the witness stand on his own behalf. He acknowledged that he had shot Manning, but claimed that he acted in self-defense after Manning pulled a handgun on him. The prosecution's theory, in refuting that claim, was that Allen's conduct was not consistent with his proffered defense. The government focused on Allen's flight and on what he did and did not do at the scene. The prosecutor pressed Allen on cross-examination as to any attempt that he may have made to ensure that Gerard, a friend of Allen's who was with him at the time of the shooting, would be available to testify, and that any favorable physical evidence would be preserved. The prosecutor also argued these points to the jury. Counsel for Allen objected to the prosecution's approach on the ground that the prosecution's tactics were in violation of the missing witness and missing evidence rules and that the prosecution was shifting the burden of proof.

The prosecutor acknowledged at one point that he had come "very close to the line about missing witness." The judge, however, overruled Allen's missing witness, missing evidence, and burden-shifting objections. Allen was ultimately acquitted of murder while armed, but convicted of manslaughter while armed and of carrying a pistol without a license. This appeal followed.

II

LEGAL DISCUSSION

A. *The Missing Witness and Missing Evidence Inference.*

■ Allen, as we have noted, admitted at trial that he killed Manning, but claimed to have done so to protect his own life. Once he had introduced that issue into the case, the government was required to prove beyond a reasonable doubt that Allen had not acted in self-defense. *Bynum v. United States,* 133 U.S.App.D.C. 4, 5, 408 F.2d 1207, 1208, *cert. denied,* 394 U.S. 935, 89 S.Ct. 1211, 22 L.Ed.2d 466 (1968). Manning was dead, and his version of the encounter was not available to the jury. In order to contest Allen's proffered justification, the prosecutor was obliged to probe Allen's account to determine if it was consistent with the claim of self-defense. The prosecutor attempted to demonstrate that although Allen's words at trial supported the claim of innocence, his conduct at the time of Manning's death did not.

---

**2.** On June 6, 1986, after having been indicted for first degree murder while armed and carrying a pistol without a license, Allen entered a plea of guilty to second degree murder and to the weapons offense. The record of that plea proceeding is not before us, but Allen evidently made no claim of self-defense, for he was required to admit his guilt before the plea could be accepted. Sentencing was scheduled for July 17, 1986.

While awaiting sentence, Allen wrote two letters to the trial judge. In each, he explained that he was on drugs at the time of the crime and that he was very sorry for what he had done. On each occasion, he asked the judge to be merciful. He mentioned in the first of these letters that "I was on drugs and I see that my life was in danger", apparently from the drugs.

He said nothing in either communication about Manning having pulled a handgun on him.

On July 28, 1986, through his prior counsel, Allen filed a motion to withdraw his plea of guilty. He asserted that "the decedent, Mr. Samuel Manning, did in fact have a gun on his person on November 13, 1983, and was in fact attempting to use it against the defendant." Over the government's objection, the trial judge granted Allen's motion to withdraw his plea, and the case went to trial on September 10, 1987, nearly four years after Manning's death.

On September 8, 1987, two days before the trial began, Allen attempted once again to enter a plea of guilty, but the judge declined to accept it because Allen did not unequivocally admit his guilt.

A principal issue at trial concerned Allen's state of mind. The question presented to the jury was whether Allen shot and killed Manning with criminal intent or in self-defense. Allen's intent could not "be proved directly, because there is no way of fathoming and scrutinizing the operations of the human mind." *Allen v. United States,* 136 U.S.App.D.C. 381, 383 n. 1, 420 F.2d 223, 225 n. 1 (1969). Instead, his state of mind could best be inferred from the surrounding circumstances. *Id.* at 383, 420 F.2d at 225; *see also* Criminal Jury Instructions for the District of Columbia, No. 3.02 (3d ed.1978).

 It cannot be gainsaid that, in probing Allen's conduct to determine whether it matched Allen's claimed state of mind, the prosecutor incidentally brought to the jury's attention Allen's failure to undertake efforts to collect or preserve evidence arguably relevant to self-defense, an issue as to which the government, not Allen, bore the burden of proof. We are of the opinion, however, that the trial judge acted reasonably in permitting the prosecutor to do so. The division majority thought that the government's position that the prosecutor's questioning was permissible "undermines the missing evidence and missing witness rule." 579 A.2d at 232. Our view is the exact converse; Allen's attempt to extend the missing evidence doctrine to reach the facts here undermines the prosecution's right to conduct a thorough exploration and exposition of relevant facts, and therefore impairs the even-handed balance that is essential to adversarial litigation.[3]

Over defense objection, the judge permitted the prosecutor to cross-examine Allen in detail about his conduct after Manning's death. Did Allen look for Gerard after the shooting? Did he ask his sister to keep the van from which he said he had shot Manning? Did he attempt to preserve a shell casing which may have "popped out" after he fired the fatal shot? Did he and Gerard search the van to see if there was anything in it that could support his claim that he had acted in self-defense? Did he ask Gerard to preserve the weapon with which he (Allen) had killed Manning? Did he request Gerard to keep in touch "so he could say what really happened in the van?" In his rebuttal argument, the prosecutor re-emphasized that if Allen had truly acted in self-defense he would have "scoured that van to get that shell casing and to preserve the gun" and would have "tried to keep Gerard or Gerald, or know his last name." He argued that Allen "did nothing, nothing to preserve what would support him." A similar theme appeared in the prosecutor's initial argument as well.

Allen contends that "the inference the government was urging was that appellant's failure to produce the gun, the shell casing or Gerard created the presumption that the [evidence] if produced would be unfavorable." We cannot agree that the prosecutor was urging such a presumption, either directly or implicitly. Rather, the prosecutor's focus was on the plausibility of Allen's claim of self-defense in light of his pre-arrest conduct, and not on any missing witness or missing evidence inference.

During cross-examination, the prosecutor sought to show that if Allen had killed Manning justifiably in self-defense, then it would have been logical for him to do what he could to enable the authorities to find out what really happened. Specifically, the prosecutor suggested that an innocent man would have kept the pistol, searched the car for clues, told his sister and brother-in-law about Manning's death, attempted with their help to preserve the van and its con-

---

[3]. "When a defendant in a criminal trial takes the stand the scope of cross-examination is very broad." *United States v. Raper,* 219 U.S.App. D.C. 243, 248, 676 F.2d 841, 846 (1982). Indeed, as the trial judge instructed the jury in *Raper,* "when you put [the defendant] on [the stand], the prosecutor can ask him anything that might have any relevance to the case. And that includes what color eyes his grandmother's cow has, if it shed[s] any light on the issues of this case." *Id.* at 248, 676 F.2d at 846. Obviously, this does not mean that the cross-examination can embrace privileged or otherwise objectionable matters. The importance of providing the prosecutor with a fair opportunity to cross-examine a testifying defendant, however, militates against applying here what we regard as an unwarranted extension of the missing witness and missing evidence doctrine.

tents, and requested Gerard to stay in touch. Similarly, in his closing argument, the prosecutor focused on what Allen did after the killing. He did not argue or even mention Gerard's absence from the trial. As the trial judge put it, such cross-examination [4] "shows the jury something about whether [Allen's] conduct is consistent with [that of] a man who tells the story he's telling here today."

The missing witness and missing evidence rules focus on the impact on the jury of the defendant's nonproduction of evidence at trial. To put it in the vernacular, the prosecutor—or, indeed, any attorney—should not be allowed to mislead the jury by trying to make something out of nothing. We are of the opinion, however, that this wise policy is not significantly implicated here. The government was not making something out of nothing. Rather, as the trial judge recognized, the prosecutor was asking the jury to draw reasonable inferences from Allen's conduct at a time when actions spoke louder than words.

 Allen maintains, not implausibly, that there were legitimate reasons for his failure to preserve evidence immediately after the killing.[5] He had every opportunity, however, to explain these reasons to the jury.[6] The overall character of Allen's con-

duct at the time—his failure to report Manning's death or to preserve the scene for investigators, his flight, and his assumption of an assumed identity—were all relevant to an informed assessment of his state of mind. The prosecutor's concentration on this theme during cross-examination and in closing argument did not, in our view, run afoul of the missing witness or missing evidence doctrine.

It is axiomatic that the trial judge, who is on the scene and has an opportunity to obtain a "feel" for the case which is not available to an appellate court reviewing a paper record, is invested with wide latitude in determining the permissible limits of cross-examination, see *Springer v. United States*, 388 A.2d 846, 854 (D.C.1978), and of closing argument, *Irick v. United States*, 565 A.2d 26, 32 (D.C.1989). Allen has failed to show abuse of that discretion.

### B. Shifting the Burden of Proof.

Allen contends that the prosecutor impermissibly shifted the burden of proof to him with respect to the issue of self-defense. He says that this occurred both during cross-examination and in closing argument. We disagree.

---

4. And, by analogy, such argument.

5. Allen argues as follows in his Reply Brief: The van or condition of the van would have proved nothing since there was no testimony that Manning fired *into* the van or damaged it in any way. Preserving the gun or shell casing would have been equally meaningless since there was no dispute that the defendant used a gun to kill the decedent. The only question was why. It was the location of the shell casing, not the shell casing itself, that was important, as proof of where the shooting occurred. Thus, it would have been useless for appellant to search the van for a shell casing because having a shell casing in court does not prove where it came from, or that it was the same shell casing. The jury would still have to take appellant's word on that. Moreover, it is wholly unreasonable to expect that after the shooting, appellant could predict that, in a future trial, the location of the shooting would be in dispute and that an ejected shell casing may help prove the location. It takes lawyers and police technicians years of education and training to learn about the significance of such details.

Gerard could have elucidated the transaction had he been available. However, it is wholly unreasonable to think that after being involved in the emotionally wrenching experience of having to kill his best friend, appellant, who has no legal expertise, would immediately start keeping a list of witnesses for possible future use in court. Nor was there any reason to believe that Gerard would want to cooperate with appellant in such trial preparation or that appellant would have any reason to think he could not find Gerard if he needed him in the future.

6. *Cf. Dixon v. United States*, 565 A.2d 72, 80 n. 15 (D.C.1989):

It may be appropriate to observe that the prosecutor's having argued [an allegedly improper theme] did not preclude defense counsel from arguing the contrary. In fact, defense counsel did so, forcefully and in detail. Like many other issues, this one was appropriately left to the jury to decide after each side had its say.

*Accord, Mills v. United States*, 599 A.2d 775, 786 (D.C.1991).

Early in his instructions, the judge explained the presumption of innocence. He told the jury that the government had the burden to prove Allen's guilt beyond a reasonable doubt. He specifically stated that this burden of proof never shifts. He again referred to the requirement of proof beyond a reasonable doubt on each occasion that he explained the elements of a particular offense.[7] Addressing the question of self-defense, the judge said:

> The defendant is not required to prove that he acted in self defense. Where evidence of self-defense is present, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the government has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, it is your duty to find him not guilty. And that applies to all the levels of homicide that you may consider, depending on what you find as the facts of this case.

Given the clarity of these instructions and the ease with which any reasonable person could understand them, we think it a propos to invoke here Justice Holmes' observation for the Court in *Graham v. United States*, 231 U.S. 474, 481, 34 S.Ct. 148, 152, 58 L.Ed. 319 (1913) that "[i]t would be absurd to upset a verdict upon a speculation that the jury did not do their duty and follow the instructions of the court." *See also Coates v. United States*, 558 A.2d 1148, 1150 (D.C.1989).

■ The judge also instructed the jurors that "it is your duty to accept the law as I state it to you." Accordingly, even if the prosecutor had argued that Allen had the burden of proof with respect to self-defense, one would presume that the jury applied the law as stated by the judge, not by the prosecutor. *See Boyde v. California*, 494 U.S. 370, 385, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990). In any event, the prosecutor presented no such contention.[8] On the contrary, he began his rebuttal argument by agreeing that

> [defense counsel] is right. The government has to prove and you have to be satisfied beyond a reasonable doubt as to every element of the offenses of first-degree murder or of second-degree murder or voluntary manslaughter while armed. And *you have to be satisfied beyond a reasonable doubt, if there's evidence of self-defense, that he didn't act in self-defense.*

(Emphasis added.) Since the judge, the prosecutor and the defense attorney[9] were all in agreement on this undisputed point of law, we are at a loss to understand how the jurors could possibly have been misled as to which party had the burden of proof. Probative evidence[10] should not be excluded because of "crabbed notions of relevance or excessive mistrust of juries." *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir.1987) (Posner, J.).

■ It is, of course, true that the prosecutor had the burden of proof with respect to the issue of self-defense and that his cross-examination and closing argument revealed the lack of evidence presented by the defense on that subject. That is by no means equivalent, however, to an attempt to "shift" the burden.[11] In *McCowan v.*

7. Since the judge instructed on a number of lesser included offenses, the jurors heard this several times.

8. On one occasion, the prosecutor, in what the judge later characterized as a "slip of the tongue," asked Allen if he and Gerard had searched the van to determine if there was anything in it that could help prove that he acted in self-defense. The question was interrupted by an objection. The judge stated that *"he doesn't have to prove it."* Later, contradicting a defense contention that the jury had not heard this remark, the judge stated that "I barked it out." The judge's description of his tone of voice amounted to a judicial finding that the jurors heard him correct the prosecutor's statement and that the problem was therefore resolved on the spot. Since there is no evidence to the contrary, the judge's finding is binding on us.

9. As one might expect, defense counsel energetically emphasized to the jury that the government had the burden to prove guilt beyond a reasonable doubt on all issues, specifically including the issue of self-defense.

10. And arguments based on reasonable inferences from such evidence.

11. A prosecutor may comment on the failure of the *defense,* as opposed to the defendant, to

*United States,* 458 A.2d 1191, 1197 (D.C. 1983), this court resolved an issue similar to the one presented here as follows:

> Appellant also claims that the prosecutor erroneously represented to the jury during argument that he bore a burden of proof regarding his inability to explain his whereabouts on July 8. Our reading of the record indicates, to the contrary, that the prosecutor's argument was directed at the unreasonableness of appellant's limited attempts to ascertain his whereabouts. It did not assert, explicitly or implicitly, that appellant was burdened with proving his whereabouts. *Cf. Whalen v. United States,* 379 A.2d 1152, 1165 (D.C.1977) (prosecutor's closing is proper where it refers to appellant's inability, prior to trial, to explain his whereabouts to a co-worker and does not refer to appellant's failure to testify at trial), *rev'd on other grounds,* 445 U.S. 684 [100 S.Ct. 1432, 63 L.Ed.2d 715].

> \* \* \* \* \* \*

> The court, moreover, instructed the jury several times that appellant bore no burden of proof. We presume the jury understood and followed those instructions.

(Citations omitted.) *See also United States v. Sensi,* 279 U.S.App.D.C. 42, 53–54, 879 F.2d 888, 899–900 (1989) (prosecutor's comment that defendant's testimony was corroborated only by witnesses that he "never produced at this trial" did not shift the burden of proof); *United States v. Johnson,* 713 F.2d 633, 651 (11th Cir.1983), (prosecutor's emphasis on defense's failure to produce evidence to rebut reasonable inference from government's evidence was proper where prosecutor acknowledged that government bore burden of proof and

trial judge so instructed), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Glantz,* 810 F.2d 316, 321 (1st Cir.) (prosecutor may comment on defendant's failure to produce evidence supporting his theory of the case and may attack the weak evidentiary foundation on which the defense rests),[12] *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *United States v. Gotchis,* 803 F.2d 74, 79–81 (2d Cir.1986) (prosecutor's comment that the defendant could have produced but did not produce evidence that he was a cocaine user and that drugs in his possession were not for distribution did not suggest that the defendant had an obligation to produce those witnesses or shift the burden of proof).[13]

## C. Lack of Prejudice.

 Moreover, we are satisfied that Allen was not substantially prejudiced by the prosecutorial actions of which he complains. In assessing cases of alleged prosecutorial impropriety, we consider its gravity, its relationship to the guilt or innocence of the accused, the effect of any corrective action, and the strength of the government's case. *See McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). Our appraisal of these factors persuades us that even if the prosecutor's cross-examination and closing argument had been improper, reversal would not be warranted.

For the reasons previously described in this opinion, we do not think that there was any prosecutorial impropriety at all; *a fortiori,* it was not shown to be grave. Moreover, any relation to the issue of guilt or innocence was attenuated. The challenged cross-examination and arguments constitut-

---

counter or explain the evidence. *United States v. Borchardt,* 809 F.2d 1115, 1119 (5th Cir.1987). When a defendant testifies, as Allen did, on the merits of the case, the prosecutor may also comment on his failure to explain or deny incriminating facts already in evidence. *McGahee v. Massey,* 667 F.2d 1357, 1362 (11th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982).

**12.** Since the judge instructed the jury, and the prosecutor acknowledged, that the government bore the burden of proof as to self-defense, and since *McCowan* and the other cases cited permit

comment on omissions from, and the perceived weakness of, the defense case, we cannot agree with Allen's claim that the judge did not focus on the problem identified by defense counsel. The court's instruction as to which party had the burden applied to any situation that arose, whether defense counsel "identified" it or not.

**13.** Since, in the present case, the prosecutor's reference was to what Allen failed to preserve at the time of Manning's death, rather than to what he failed to present to the court, the reasoning of *Sensi, Johnson, Glantz* and *Gotchis* applies *a fortiori.*

ed only a small part of the record in a week-long, spiritedly contested trial. Allen acknowledges that it was proper for the prosecutor to cross-examine him about his flight, his assumed identity, his false statements to the authorities, and his alleged threats to witnesses. It is difficult to escape the conclusion that a reasonable juror would view these aspects of Allen's conduct after the killing far more gravely than his alleged failure to preserve evidence, which Allen was given the opportunity to, and did, explain.

Moreover, subsequent developments at the trial effectively dissipated any conceivable prejudice. The trial judge permitted Allen to present evidence regarding his efforts to locate Gerard. Allen also explained his inability to find the pistol and the shell casings, pointing out that he did not see the van for approximately two months after the shooting. Thus, on a subject which Allen himself views as collateral or even bogus, *see* note 5, *supra,* the jury heard not only the prosecutor's questions and arguments, but also Allen's sworn testimony.[14] Since the trial judge instructed the jury that the testimony of the witnesses was evidence, but that the questions and arguments of counsel were not,[15] we find it difficult to discern how Allen could have been prejudiced.

Finally, by any reasonable standard, the prosecution case was a formidable one. Allen did not argue in his brief, nor could he persuasively have done so, that the evidence against him was weak or marginal. The government's summary is instructive:

> Prior to the shooting, appellant had said he intended to kill Manning. Two eyewitnesses testified about the shooting and related that it occurred in a manner entirely different from that described by appellant. The evidence also showed that appellant fled the scene immediately following the killing and shortly thereafter telephoned Johnson's apartment to ask about Manning. When he was told that he had killed Manning and that the police were there, appellant hung up. Appellant later fled the District of Columbia to Miami, Florida, and attempted to establish a new identity. When he was finally apprehended in Florida, he denied being Claude Allen and denied knowing anything about the killing of Manning.[16] Then, while awaiting trial in the District of Columbia, appellant threatened to harm one of the eyewitnesses and her boyfriend if she testified against appellant.

Allen was substantially impeached. He contradicted himself on a number of issues. In particular, he told an officer that Gerard shot at Manning, but later testified that

---

**14.** The division majority cited *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1980) for the proposition that permitting the defendant to explain post-arrest silence will not cure the infringement of his constitutional privilege against self-incrimination occasioned by the prosecutor's questioning of him on that subject. That decision turned on the applicability of "grave constitutional overtones," *id.* at 180 n. 7, 95 S.Ct. at 2138 n. 7, which are not present here.

**15.** As Judge Fahy stated for the court in *Burgess v. United States,* 142 U.S.App.D.C. 198, 207, 440 F.2d 226, 235 (1970),

> [a]rgument of counsel is on quite a different legal level from an instruction of the court granting to the jury the right to draw the inference of unfavorable testimony. Such an instruction has the weight of law, even when it only permits and does not require the inference, whereas counsel's argument is only that.

**16.** "False exculpatory statements made to law enforcement officers constitute independent cir-

cumstantial evidence of guilty consciousness." *Irick, supra,* 565 A.2d at 30 n. 8 (citations omitted). As we recently stated in *Mills, supra* note 6, 599 A.2d at 783–84 (quoting JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW, § 278 at 133) (James A. Chadbourn Rev.Ed.1979),

> [i]t has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood or other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

(Emphasis as in *Mills* ).

Gerard did not. His credibility was further undermined by his admission that he obtained false papers, including a false birth certificate, from an unidentified lawyer for $150. Given these facts and the powerful inference of consciousness of guilt arising from his false protestations of innocence following his apprehension, it is most unlikely that the challenged prosecutorial actions affected the jury's verdict.[17]

In *Thomas v. United States,* 447 A.2d 52, 59 (D.C.1982), this court stated that "where the defendant's credibility is a key issue and the missing witness inference goes to that credibility, an improper argument or instruction will ordinarily require reversal." We have, however, appropriately retained some flexibility in this regard. In *Lemon v. United States,* 564 A.2d 1368 (D.C.1989), for example, the prosecutor made what we characterized as almost a "complete" missing witness argument. Moreover, he did so in part with respect to witnesses who were in the courthouse and available to testify for either side. Nevertheless, we affirmed the defendant's conviction because the evidence against him was compelling and because

> [t]he absence from the witness stand of all but one of the persons who were supposed to have been with [the defendant] on the night of the crime would have been obvious to the jury no matter what the prosecutor said, and the judge correctly instructed the jury that the government had the burden of proof beyond a reasonable doubt and that the defendant had no obligation to prove anything.

*Id.* at 1376.

Where, as in our view here, the factors enumerated in *McGrier* and *Lemon* point to affirmance, we should not assume too readily that jurors were misled by some arguably "close to the line" prosecutorial comment. In the final analysis, courts should generally place their trust in the ability of jurors to apply their common sense and good judgment to the case at hand and to base their verdict on the evidence rather than on assertedly improper arguments by attorneys. "Jurors are quite capable of detecting prosecutorial non sequiturs." *Mills, supra,* 599 A.2d at 786. Professor McCormick has stated, and we agree, that "[i]t is wiser to hold that if an argument on failure to produce proof is fallacious, the remedy is the usual one, namely the answering argument and the jury's good sense." McCORMICK, *supra,* § 272 at 807–08.

Proportionality is of consummate importance in judicious adjudication. The Mikado's "object all sublime" to let the punishment fit the crime may be as readily applied to prosecutorial errors as to the misdeeds of those who transgress our criminal statutes. A relatively minor impropriety by the prosecution which is unlikely to cause substantial prejudice to the accused should not result in the drastic consequence of setting aside a conviction.

In determining whether reversal is proportionate to the alleged violation in this case, we do well to be guided by the wisdom of Judge Learned Hand. In *United States v. Cotter,* 60 F.2d 689 (2d Cir. 1932), the appellant demanded that his conviction be reversed because the prosecutor illogically invoked the missing witness principle in closing argument. In his opinion for the court affirming the conviction, Judge Hand wrote that

> [a] judge is not required to intervene here any more than in any other issue of fact. He must indeed, as he always must, keep the prosecution in a criminal case within bounds ... just as he must keep passion out of the debate and hold the parties to the issues. *But he is not charged with correcting their non sequiturs; the jury are to find these for themselves.*

*Id.* at 692 (emphasis added).

Nor is Judge Hand's assessment obsolete; as we recently stated in *Mills, supra,* 599 A.2d at 786 (quoting *Boyde, supra,* 494 U.S. at 384, 110 S.Ct. at 1200),

---

17. In fact, Allen was acquitted of murder while armed but convicted of manslaughter while armed.

arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.

In this case, as we have noted, the judge made it crystal clear that the defendant did not have to prove anything.

"There being no appreciable possibility that the [prosecutor's allegedly improper tactics] contributed to [Allen's] conviction, it would be a waste of time and resources, and might imperil justice, to try him all over again." *Helm v. United States*, 555 A.2d 465, 469 (D.C.1989). "It is not always so easy for the government to reassemble its witnesses and evidence for a return match, or for witnesses to remember what happened many years ago." *Id.* at 469 n. 9.[18] Moreover, "the addition of an old case to an overloaded docket requires the deferral of newer ones, in some of which pre-

sumptively innocent defendants may be in pretrial detention." *Scott v. United States*, 559 A.2d 745, 766 (D.C.1989) (en banc) (concurring opinion). Finally, appellate reversal of a conviction for an alleged error which has played no role in bringing about the judgment—and that, in our view, is exactly what Allen is seeking here— "encourages litigants to abuse the judicial process and bestirs the public to ridicule it." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

Perfection is a rare commodity. Courts should treat as a meaningful guide to judicial analysis, rather than as mere rhetorical flourish, the Supreme Court's oft-repeated directive that a criminal defendant has a right to a fair trial, not to a perfect one. *See, e.g. Ross v. Oklahoma*, 487 U.S. 81, 91, 108 S.Ct. 2273, 2280, 101 L.Ed.2d 80 (1988).[19] Allen received all of the protections to which he was entitled, and his conviction must be and it is hereby

*Affirmed.*[20]

(Citations omitted).

---

18. In the present case, these difficulties are compounded by delays occasioned not only by Allen's flight and concealment, but also by his original plea of guilty to second degree murder and to carrying a pistol without a license, later withdrawn. It is now more than six and a half years since Manning's death.

19. As the Court stated in *United States v. Mechanik*, 475 U.S. 66, 72, 106 S.Ct. 938, 942–43, 89 L.Ed.2d 50 (1986),

[t]he reversal of a conviction entails substantial social costs; it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; victims may be asked to relive their disturbing experiences

.... The '[p]assage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible' ... Thus, while reversal 'may, in theory, entitle the defendant only to retrial, in practice it may reward the accused with complete freedom from prosecution,' ... and thereby 'cost society the right to punish admitted offenders'.... These [and other] *societal costs of reversal* and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial.

20. Acting on their own initiative, our concurring colleagues have proposed some quite detailed guidelines for trial judges regarding the proper scope of cross-examination and closing argument where an inference of consciousness of guilt has been raised. No question regarding such an inference was argued before the trial judge. An examination of the questions presented and of the argument headings in the briefs in this court reveals no mention whatever of consciousness of guilt issues. On the contrary, Allen's objection to the prosecutor's actions, both in the trial court and in this court, *related exclusively to his alleged violation of missing evidence and missing witness principles* and his alleged shifting of the burden of proof. In our order granting the government's petition for rehearing en banc, we explicitly directed counsel to be prepared to address at argument the question "whether the prosecutor's cross examination of the defendant and the prosecutor's closing argument *improperly invited the jury to make missing witness and missing evidence inferences.*" *Allen II*, 584 A.2d at 604 (emphasis added). Although there was some brief incidental discussion of consciousness of guilt inferences in the petition and in argument before the full court, neither party was asked to propose guidelines on the subject, and neither did so.

Under these circumstances, we do not think that this is an appropriate occasion to provide

ROGERS, Chief Judge, with whom FERREN and TERRY, Associate Judges, join, concurring:

This appeal involves a prosecutor's attempt to impeach a defendant who had raised a self-defense claim by questioning him about his failure to preserve evidence at the scene of the crime. At trial "[s]pecifically, the prosecutor suggested that an innocent man would have kept the pistol, searched the car for clues, told his sister and brother-in-law about Manning's death, attempted with their help to preserve the van and its contents, and requested Gerard to stay in touch." *See* opinion of Judge Schwelb at 7. Such an inference cannot, in my view, be taken at face value, but requires a reasoned exercise of discretion by the trial judge in accordance with *Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979) ("determinations committed to the trial court's discretion are rational acts of decision-making" and "the act of compiling and preserving a factual record enables the reviewing court to determine whether the decision-maker's choice was both reasonable and proper in the specific factual context") (citations omitted). While I would affirm the judgment, I reach this conclusion only after analyzing the nature of the consciousness-of-guilt interference; without such an analysis, appellate review becomes largely perfunctory,[1] and is inconsistent with the teachings of *Johnson, supra,* 398 A.2d at 364–65.

## I

Of concern to the en banc court is Allen's contention that his cross-examination by the prosecutor and the prosecutor's closing arguments improperly invited the jury to make missing witness and missing evidence inferences, and thereby shifted the burden of proof to him.[2] In making a proffer to

---

unsolicited guidance to the trial court on an issue different from the one which the parties briefed and which we agreed to decide. *Cf. Barrera v. United States,* 599 A.2d 1119, 1137–38 (D.C.1991) (opinion of Farrell, J., concurring on behalf of a majority of the division). Our colleagues' views as to what it may or may not behoove trial judges to do when such a question arises have not been tested by "the fires of adversary presentation." *United States v. Crawley,* 837 F.2d 291, 293 (7th Cir.1988). Moreover, an issue is ripe for adjudication only when the parties' rights may be immediately affected by it. *Smith v. Smith,* 310 A.2d 229, 231 (D.C. 1973). There is no indication that trial judges have had any particular difficulty with consciousness of guilt evidence, or that en banc treatment of it is warranted. Moreover, in his discussion of a defendant's conduct as reflecting consciousness of guilt, Dean Wigmore has stated that

- [t]his sort of evidence is admitted because there is a certain degree of uniformity in its meaning, but the variations from uniformity are so frequent, and depend so much upon personal character and local circumstances that *no fixed rules should be laid down.* Repeated judicial warnings tell us that the evidence is merely to be estimated as best we can in the light of our knowledge of human nature in general and of the accused in particular.

II WIGMORE, *supra,* § 273, at 117 (emphasis in original). Agreeing with Dean Wigmore, we decline to issue en banc guidelines which are plainly not required to decide this case, *see Smith, supra,* 310 A.2d at 231, and which, if Wigmore is right, ought never to be promulgated at all.

Allen has also raised several other claims of error, unrelated to the missing evidence and missing witness issues. For the reasons stated by the division, we conclude that evidence of an out-of-court declarant's statement to Manning that Allen was coming to kill him was not inadmissible hearsay and was properly received. *Allen I, supra,* 579 A.2d at 228–30. We further hold that the judge did not abuse his discretion in excluding proffered evidence as to certain violent incidents that allegedly occurred in Florida months after Manning's death, *see German v. United States,* 525 A.2d 596, 609 (D.C.1987), or in permitting the prosecutor to cross-examine a defense investigator in a manner that allegedly resulted in the disclosure of prior consistent statements by two prosecution witnesses. *See District of Columbia v. Bethel,* 567 A.2d 1331, 1336 (D.C.1990); *Moss v. United States,* 368 A.2d 1131, 1134 (D.C.1977); *Coltrane v. United States,* 135 U.S.App.D.C. 295, 304, 418 F.2d 1131, 1140 (1969). Even if these determinations by the trial judge had been erroneous, which they were not, we are satisfied that any error would have been harmless.

1. The majority concludes that the trial judge "acted reasonably" by allowing the cross-examination about Allen's failures to act. Majority opinion at 1222.

2. I adopt the views stated by the division majority in finding neither inadmissible hearsay nor abuse of discretion by the trial judge in concluding that the jury could follow the limiting instruction. *Allen v. United States,* 579 A.2d 225, 228–30 (D.C.1990).

the trial judge, the prosecutor acknowledged that what he sought to do would come very close to crossing the lines drawn by the missing witness and missing evidence rules.[3] The government responded on appeal that, with the exception of one question on cross-examination, no missing witness or missing evidence inference was raised; that the trial judge could reasonably conclude there was sufficient inconsistency between Allen's claim of self-defense and his actions after the shooting to render the cross-examination probative; and that the cross-examination and closing argument to the jury, about Allen's failure to preserve evidence after the shooting, gave rise to a permissible inference of consciousness of guilt, and hence were proper.[4]

### A.

Subject to constitutional limitations, it is beyond dispute that the trial judge has broad discretion in deciding whether to permit cross examination and how much. *See Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990); *Springer v. United States,* 388 A.2d 846, 854–55 (D.C.1978); *see also Morrison v. United States,* 547 A.2d 996,

998 (D.C.1988). Directly related to this exercise of discretion is the general question of the admissibility of evidence, namely, whether evidence is relevant and material, and more probative than prejudicial. This question is distinct, however, from the question of whether the evidence would prove an asserted fact, which, by contrast, is for the trier of fact to decide. Thus, in determining whether to permit cross-examination, the judge's exercise of discretion is confined to considering the question of general admissibility. In the instant case, the question of general admissibility before the trial judge was whether a reasonable jury could reasonably find, based on the proffered cross-examination of Allen, that his failures to preserve evidence showed his consciousness of guilt.

The en banc court has examined for the first time whether the missing witness and missing evidence rules should apply to a prosecutor's attempt to raise an inference that the defendant's failure to preserve evidence and a witness at the scene of a crime demonstrate that he was conscious of his own guilt. Although the risks arising from the ambiguity of nonconduct may be similar whether the context is a defen-

---

3. The prosecutor conceded that his proposed cross examination regarding Allen's efforts to locate his companion Gerard "does get very close to the line about missing witness, that his circumstances were such that he should have, he should have gotten a hold of Gerard, he should have found him, and he should have looked for that shell casing, it must have remained in there, so that he could establish his self-defense."

4. Judge Schwelb maintains that although the evidence of Allen's inaction was offered by the government for the purposes of showing his consciousness of guilt, the en banc court is precluded from examining the nature of that inference in the context of this case. *See* opinion of Judge Schwelb at 1228 n. 20. Yet the government's consistent position has been that evidence of Allen's failure to act was admissible to show inconsistency with his claim of self-defense, and that post-crime failure to act was relevant to show his state of mind. It analogized the circumstances of the instant case to our decisions regarding flight and concealment of evidence. In citing in its brief *Christian v. United States,* 394 A.2d 1, 32–33 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979), the government pointed directly to

the court's statement that "[i]t is generally accepted that the flight of an accused is a fact which tends to prove his consciousness of guilt and thus guilt itself" (citations omitted), and "[t]he inferences which a jury may properly draw from such concealment are almost identical to those of flight." It is an extraordinary proposition that an appellate court may not examine the premise underlying a party's assertion in providing a reasoned analysis for the decision on appeal.

In its petition for rehearing en banc, the government told the en banc court that "What the [division] majority fails to apprehend is that the failure to take such actions may constitute evidence of a defendant's consciousness of guilt just as much as his affirmative acts of flight and concealment, which the majority concedes are admissible." The government further told the en banc court that "[i]n the instant case, ... it is clear that the inference sought to be drawn from [Allen's] failure to attempt to preserve evidence and witnesses is the inference of consciousness of guilt, not the missing witness inference." This is the position that must be examined, and articulating what underlies the inference facilitates the exercise of reasoned discretion and appellate review.

dant's failure to act shortly after a crime or a failure to act at trial, the full en banc court has concluded, and I agree, that the missing witness and missing evidence rules should apply only to inferences about the defendant's failure to present evidence or witnesses at trial.

The rationale for the missing witness and missing evidence rules focuses on the impact on the jury of the defendant's nonproduction of evidence at trial. *See Graves v. United States,* 150 U.S. 118, 120–21, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893) (closing argument raised improper missing witness inference when defendant was prevented from calling the witness due to the fact his wife, who was otherwise available, was not a competent witness against him); *Brown v. United States,* 555 A.2d 1034, 1036 (D.C. 1989) (when inference is appropriate, "the trial court may instruct the jury that it may infer that the testimony of [the missing] witness could have been unfavorable to the party to whom the witness was available"). This rationale does not immunize the defendant who asserts a self-defense claim from the consequences of his failure to act in a manner consistent with his testimony at trial. *Cf. Grunewald v. United States,* 353 U.S. 391, 420, 77 S.Ct. 963, 982, 1 L.Ed.2d 931 (1957) (defendant's credibility subject to impeachment "just like any other witness").

In other contexts the court has recognized that the defendant's post-offense conduct is relevant to the defendant's state of mind to show consciousness of guilt. *Gale v. United States,* 391 A.2d 230, 235 (D.C. 1978) ("evidence of restitution, like that of other post-crime conduct such as flight, concealment, or intimidation of a witness, is ordinarily admissible as relevant to and probative of consciousness of guilt"), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979); *Christian, supra* note 4, 394 A.2d at 32 (defendant's flight or concealment of evidence tends to show consciousness of guilt). Some instances of inaction are also recognized as probative of the defendant's intent in light of the asserted defense. *See Jenkins v. Anderson,* 447 U.S. 231, 235, 100 S.Ct. 2124, 2127, 65 L.Ed.2d 86 (1980) (no Fifth Amendment violation when the defendant is impeached by his failure to report earlier his assertion of self-defense); *see also Cain v. United States,* 532 A.2d 1001, 1005–06 (D.C.1987) (proper to ask defense witness about his post-offense silence and failure to contact law enforcement officials); *State v. Brown,* 128 N.H. 606, 517 A.2d 831, 834 (1986) (proper to ask victim whether defendant visited or contacted victim, where defendant claimed shooting was accidental, since silence in such circumstances "has some tendency to indicate that there is no regret because the injury was intended"). Therefore, the consciousness of guilt inference based on the defendant's failure to preserve evidence is, like impeachment by post-arrest silence, an example of a proper inference that may be raised without re-course to the missing witness and missing evidence rules.

### B.

Although the consciousness of guilt inference drawn from the defendant's failure to preserve evidence may be analytically distinct from the classic "missing witness" inference, both are examples of inferences based on ambiguous conduct. In both, the fact-finder is being asked to draw an inference from the defendant's inaction. In both, the validity of the inference turns on the defendant's state of mind. The problem with drawing inferences from inaction is that in many cases there are plausible explanations for a defendant's failure to act that do not indicate consciousness of guilt. *See Walker v. United States,* 402 A.2d 424, 427 (D.C.1979) (error to permit the use of the defendant's failure to tell his parole officer that he ran away from the scene of the crime, because "there is equally convincing reasoning supporting [an innocent] inference"); *cf. Arnold v. United States,* 511 A.2d 399, 415 (D.C.1986) (requiring the prosecutor to lay a foundation before making a missing witness argument to jury). Indeed, improper inferences of this type are likely to be over-valued by juries. *See Burgess v. United States,* 142 U.S.App.D.C. 198, 206, 440 F.2d 226, 234 (1970) (noting the "fictitious weight" juries

may give to the absence of evidence). Consequently, the court has required the government to obtain prior approval of the trial judge before raising such inferences. *See, e.g., Hill v. United States,* 404 A.2d 525, 531 (D.C.1979) (per curiam) (requiring the prosecutor, before impeaching a defendant with his post-arrest silence, to "apprise the trial court of the omitted facts to be relied upon as showing inconsistency"); *cf. Price v. United States,* 531 A.2d 984, 993–94 (D.C.1987) (requiring the prosecutor to seek permission from the trial judge before raising the missing witness inference in cross-examination); *Thomas v. United States,* 447 A.2d 52, 57 (D.C.1982) (trial judge must determine existence of two preconditions before allowing prosecutor to ask jury to draw missing witness inference).

In such contexts, the court has established special standards to guide the trial court in deciding whether to permit the government to raise such an inference. *See, e.g., Ford v. United States,* 487 A.2d 580, 585–87 (D.C.1984) (before allowing the prosecutor to impeach a defendant based on prior silence, the trial judge should consider whether the defendant "failed to mention a material circumstance ... which it would have been natural to mention in the prior statement," citing McCORMICK, EVIDENCE § 34 at 68 (2d ed. 1972)); *cf. Arnold, supra,* 511 A.2d at 415 (two-prong predicate to missing witness inference). For the same reasons, when the government seeks to raise a consciousness of guilt inference based on the defendant's failure to preserve evidence relevant to a self-defense claim, there are factors that can provide guidance for the trial court in the difficult task of determining whether the inference would be reasonable with respect to specific nonconduct by the defendant, and pro-

vide this court with an adequate record to permit appellate review. *See, e.g., Johnson, supra,* 398 A.2d at 365 (in reviewing for abuse of discretion, appellate court must determine "whether the decision maker failed to consider a relevant factor, ... relied upon an improper factor, and whether the reasons given reasonably support the conclusions") (citation omitted).

### C.

A threshold decision for the trial judge was whether a reasonable jury could reasonably infer Allen's consciousness of guilt from certain nonconduct by him at the scene of the offense and shortly thereafter. The government has suggested that the court should follow *Hill, supra,* 404 A.2d 525, where the court adopted the analysis in *Hale v. United States,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). In *Hale,* the Supreme Court pointed out that "[i]f the Government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded." *Hill, supra,* 404 A.2d at 530 (quoting *Hale, supra,* 422 U.S. at 176, 95 S.Ct. at 2136).[5] Thus, not all such nonconduct will provide a basis on which a reasonable jury could infer the defendant's consciousness of guilt, and depending on the relevance and the probative as compared to the prejudicial effect of the evidence, the trial judge, in the exercise of reasoned discretion, may exclude the evidence. See note 5, *supra.* Accordingly, in *Hill, supra,* the court concluded that the prosecutor "must apprise the trial court of the omitted facts to be relied upon as showing inconsistency and the court must con-

---

5. *See* 3A WIGMORE, EVIDENCE § 1042 (Chadbourne Rev.1970) ("a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact" and constitutes a 'prima facie' inconsistency."); McCORMICK, EVIDENCE § 835 at 68 (2d ed. 1972); *see also Sampson v. United States,* 407 A.2d 574, 576 (D.C.1979) (defendant's omission of material fact may not be used to impeach him, unless it is omitted from defendant's prior statement where "it would have been natural to

mention" the material fact and later testified to by defendant at trial); *Walker, supra,* 402 A.2d at 427 (failure to tell parole officer of reason for flight insufficiently probative to permit cross-examination); *Beale v. United States,* 465 A.2d 796, 805 (D.C.1983) ("the prosecutor's impeachment and closing argument were improper" because there was no "'threshold inconsistency' between [the defendant's] testimony and his statement to the police ..."), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

sider whether such facts are sufficiently material that the failure to have mentioned them amounts to inconsistency." 404 A.2d at 531.

A similar inquiry is appropriate where the government seeks to show that the defendant's failure to take certain actions shortly after the crime demonstrates his consciousness of guilt. To raise such an inference the government must show that the defendant did not act as an innocent person in the defendant's situation would naturally have acted, but rather acted as would a guilty person under the circumstances. The inference rests on often unarticulated assumptions about what a reasonable person who is innocent of any crime would do. A three-factor approach generally identifies the circumstances in which it would be reasonable for the jury to infer that the defendant's failure to preserve evidence demonstrates consciousness of guilt. The factors are based on three assumptions:

First, the defendant's failure to preserve evidence that could corroborate a self-defense claim is probative only if an innocent person in the defendant's position would have had reason to fear that the self-defense "story" would be challenged. Even people who are completely guiltless do not go through life gathering evidence to prove their innocence. Under the first factor, therefore, the trial judge should consider whether at the time when the defendant allegedly failed to preserve evidence, an innocent person in the defendant's position would have feared prosecution for a crime.

Second, the consciousness of guilt inference is only appropriate if the importance of the evidence would have been apparent to an innocent person in the defendant's position. Otherwise the defendant's failure to preserve the evidence might have been due to ignorance or neglect, rather than a conscious recognition of guilt.

Third, the inference from the defendant's failure to take certain measures only makes sense if an innocent person in the defendant's circumstances would have believed that taking those measures was necessary to preserve the evidence and was not a futile gesture. Many preservation measures would not immediately appear necessary to an innocent person. Similarly, "the law does not require the doing of a futile act." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980). If an innocent person in the defendant's circumstances would have good reason to believe that the purported measures would not have accomplished anything, the failure to take the measures is simply meaningless.

Accordingly, where the government seeks to introduce evidence of pretrial nonconduct of the defendant in order to show the inconsistency with a claim of self-defense, the trial judge, upon a proffer by the government and an opportunity for the defense to respond, should examine whether a reasonable jury could reasonably find that the evidence of inaction by the defendant would be inconsistent with the conduct of an innocent person, and thereby give rise to an inference of the defendant's consciousness of guilt. To determine whether there is such a threshold inconsistency, the trial judge should consider whether a reasonable jury could find that an innocent person in the defendant's position would reasonably have (1) feared prosecution for a crime, (2) realized that the evidence would be important to his or her defense, and (3) believed that taking these measures would be necessary to preserve the evidence and would not be futile. Upon finding a threshold inconsistency, the trial judge must still address relevance, materiality and the probative/prejudicial effect. Whether the introduction of nonaction by the defendant would be more prejudicial than probative may depend on the extent to which the defendant is afforded the opportunity to present, and is not prevented by law from presenting, an explanation to the jury for his nonconduct.[6]

6. For example, in *Givens v. United States*, 385 A.2d 24, 27 (D.C.1978), the court found nonharmful error where the defendant, who asserted a claim of self-defense, "was never given an opportunity ... to prove to the trial court that the evidence before the jury relating to [a witness'] absence was incomplete and misleading," and the evidence that the defendant did the

*Cf. Graves, supra,* 150 U.S. at 120–21, 14 S.Ct. at 41 (missing witness closing argument unanswerable by the defendant).

Depending on the facts of an individual case, of course, other factors may be appropriate for consideration. The description of the consciousness of guilt factors here is neither exclusive nor exhaustive, and does not establish a rigid rule or a litany of complex findings to be made on the record by the trial judge. Rather, the en banc court, having determined that the missing evidence rules should not apply, cannot ignore that judicial discretion is not unlimited discretion, and that reasonableness has contours which the appellate court must be able to find in order to sustain an exercise of discretion; appellate review, like the exercise of trial court discretion, must be meaningful. *See Morrison, supra,* 547 A.2d at 998; *Johnson, supra,* 398 A.2d at 365.[7] As in *Hill, supra,* the trial judge, upon hearing the proffer of the defendant's inaction, may conclude, in the exercise of reasoned discretion upon considering the relevant factors, that "[p]roof of the omission of [conduct by the defendant] that would be crucial to a claim of self-defense does not lack significant probative value and therefore [is] admissible." 404 A.2d at 532. Appellate review of whether there has been an exercise or reasoned discretion is assisted when the trial court addresses the factors relevant to the consciousness of guilt inference that take cognizance of the unusual, and potentially ambiguous, nature of nonbehavior.

## II

Upon examining the factors underlying the consciousness of guilt inference sought by the government, I am satisfied that the trial judge, for the most part, did not erroneously exercise his discretion by allowing the prosecutor to question Allen about his failure to preserve evidence or to take other actions consistent with his self-defense claim.[8] The judge could reasonably have concluded that most of the proffered cross-examination about Allen's failure to preserve evidence at the scene of the crime related to nonconduct that was inconsistent with Allen's claim of self-defense, and that a reasonable jury could reasonably infer therefrom Allen's consciousness of guilt. With respect to those aspects of the proffer which showed no such inconsistency and, hence, provided no basis for a consciousness-of-guilt inference, I am satisfied that the erroneous exercise of discretion does not require reversal. My analysis is the same with respect to the prosecutor's closing argument to the jury.

## A.

The prosecutor advised the judge that he wished to show that Allen had acted inconsistently with his claim of self-defense by asking whether Allen had taken measures after the shooting to preserve the van and the gun he had used, and to look for the shell casing and for Gerard, who Allen claimed had driven with him in the van to and from the scene of the shooting. The prosecutor commendably alerted the trial judge to the possible prejudice of his proposed cross-examination by pointing out that it came very close to raising the missing witness and missing evidence inference. The trial judge ruled that the prosecutor

killing was abundant but the proof that defendant did not act in self-defense was entirely circumstantial and hardly overwhelming. *Id.* at 28.

7. The court has previously observed that "We must not invite the exercise of judicial impressionism. Discretion there may be, but 'methodized by analogy, disciplined by system.' Cardozo, *The Nature of the Judicial Process,* 139, 141 (1921). Discretion without criteria for its exercise is authorization of arbitrariness." *Brown v. Allen,* 344 U.S. 443, 496, 73 S.Ct. 397, 441, 97 L.Ed. 469 (1953). *Johnson, supra,* 398 A.2d at 365.

8. Were this a majority opinion, I would remand the case to the trial judge to exercise his discretion in light of the proper factors. In view of the majority disposition, however, I will review the record as though the trial judge had purported to apply the proper factors, in order to demonstrate how, on this record, they should be analyzed on review, and thereby also demonstrate the importance of having the trial court undertake an analysis of the appropriate factors in determining the general admissibility of evidence of nonconduct as the basis for suggesting the defendant's consciousness of guilt.

could attempt to discredit Allen's self-defense claim by asking if he had tried to find the other person who was with him at the time of the shooting, as distinct from the witness' absence at trial, and by questioning Allen about what he did after the shooting; an instruction to the jury, the judge stated, would make it clear that Allen had no burden of proof.

Thereafter the prosecutor cross-examined Allen about whether he ever looked for Gerard after the shooting, whether he asked his sister to keep the van, whether he attempted to preserve a shell casing that may have popped out after he fired the bullets, whether he had asked Gerard to preserve the gun that he had used, and whether he and Gerard, on the night of the shooting, had looked in the van to see if there was anything that could help prove that Allen acted in self-defense.[9] When the prosecutor asked Allen, "That night, did you and Gerard look inside the van to see if there was anything in the van that could *help prove that—*," defense counsel objected but the prosecutor continued asking the question before the judge could rule: "*—you acted in seir-defense?*" The judge stated, "He doesn't have to prove it." When defense counsel asked to come to the bench, the judge refused to let counsel do so, stating that he had overruled the objection. The judge denied Allen's request for a mistrial. While conceding that the question was "probably, notably, unartfully phrased," the judge observed that the prosecutor had rephrased the question in proper form, the answer was interrupted when the objection was made, and the final jury instruction would make clear that Allen had no such burden.[10]

In rebuttal closing argument the prosecutor told the jury, again over defense objections, that if Allen had truly acted in self-defense he would have "scoured that van to get that shell casing and to preserve the gun" and would have "tried to keep Gerard ... or know his last name." Further, he argued that Allen's self-defense claim should be disbelieved because "he did nothing, nothing to preserve what would support him." The same arguments were

---

9. The prosecutor asked the following series of questions during his cross-examination of Allen:

[Prosecutor]: Between November 13th and the time that you left for Florida did you see Gerard again?

 * * * * * *

[Q]: You didn't look for him, did you?

 * * * * * *

[Q]: Between the night of the shooting and January of 1984, did you ask your sister or your brother-in-law to hold onto the van?

 * * * * * *

[Q]: You never asked them, did you to take a look in the van and see if they could find a shell casing?

 * * * * * *

[Q]: That night, did you and Gerard look inside the van to see if there was anything in the van that could *help prove that* [defense objection] ... you acted in self defense?

 * * * * * *

[Q]: Did you ask Gerard to hold onto the gun?

[Q]: Did Gerard ask you, what do you want me to do with the gun?

 * * * * * *

[Q]: Between ... November 13, 1983, and the time that you left for Florida, did you ask your sister or brother-in-law about Gerard?

 * * * * * *

[Q]: Did you tell Gerard on the night of November 13th, that you wanted him to stay close so that he could say what really happened in the van?

 * * * * * *

[Q]: I'm just asking you, did you ask Gerard, that night, after you shot [Manning], did you ask him to stay in touch with me because you know what happened?

10. Defense counsel protested that the judge had not instructed the jury but simply "said that comment in a low tone of voice as if you were just talking to [the prosecutor]. There's no evidence that the jury heard it at all." The judge disagreed with the characterization of his tone of voice, stating "I barked it out," and declined the defense request for an instruction to be given to the jury at this time. The judge also overruled defense counsel's two objections to the question "Did you tell Gerard on the night of November 13th, that you wanted him to stay close so that he could say what really happened in the van?"

made by the prosecutor in his initial closing argument to the jury.[11]

### B.

Upon considering the factors underlying the consciousness of guilt inference, most of the cross-examination was clearly proper. With the exception of one question regarding whether Allen and Gerard looked for evidence to "help prove that . . . [Allen] acted in self-defense," which the government concedes was improper, the prosecutor observed the distinction between Allen's failure to act immediately after the shooting and Allen's failure to offer evidence at trial. The rest of the questioning and argument was limited to Allen's inaction at the time of the shooting and shortly thereafter.

Applying the "consciousness of guilt" factors to the remaining questioning and closing arguments, the trial judge would not have abused his discretion by allowing most of the questioning. First, the record indicates that the trial judge could reasonably have concluded that someone in Allen's position would naturally fear prosecution for a crime. Under the circumstances, even if Allen had shot in self-defense, he would understand the strong likelihood that he would be suspected of committing a homicide. The judge also could reasonably have concluded that the second and third factors were also satisfied with respect to many of the questions. In particular, Allen's failure either to ask Gerard to preserve the gun, or thereafter to find out Gerard's last name or attempt to contact him, could demonstrate Allen's consciousness of his own guilt; an innocent man would have had no reason to want to get rid of the gun, and would have sought to find Gerard to back up his version of what had happened. In each case, Allen's failures to act could reasonably be viewed as inconsistent with the actions of an innocent person, who would naturally realize that taking those measures would be necessary in order to preserve evidence important to establishing his innocence to the police, the prosecutor, and if all else failed, to the jury.

More problematic is the cross-examination about Allen's failure to tell Gerard on the night of the shooting "to stay close so that he would say what really happened in the van." On the one hand, Allen must have realized, as would an innocent man, that Gerard might not be willing to come forward since he might implicate himself in the shooting. As Allen maintains on appeal, asking Gerard to "stay close so that he could say what happened" might well have been a futile gesture.

On the other hand, unlike a case in which a defendant is unable to explain a witness' absence, *see, e.g., Bowles v. United States*, 142 U.S.App.D.C. 26, 31, 439 F.2d 536, 541 (1970) (en banc) (defense counsel properly required to "refrain from any mention of the decision made by [an absent witness] to invoke the Fifth Amendment"), Allen could respond to these questions regardless of whether Gerard would assert his Fifth Amendment privilege at trial. Of course, it

---

11. In his initial argument to the jury, the prosecutor referred to Allen's flight, his failures to look in the van for the cartridge case to see if it might still be there, to try to keep the gun, to try to keep hold of Gerard, but noted that "he split for Miami and started a new life."

In rebuttal closing argument, the prosecutor responded to defense counsel's argument that Allen's testimony, and that of other defense witnesses, supported his claim that he acted in self defense. The prosecutor, reminding the jury that the government, and not Allen, had the burden of proof, argued that there was "plenty of evidence" to show that Allen had not acted in self-defense, namely Allen's testimony and explanation for the events on the night of the shooting. He pointed out that the shell casing was found by the police on the sidewalk in front of the apartment house, where a government witness claimed that the shooting had occurred, and not near the van as Allen claimed. He argued that Allen did not check the van because there was no reason to check it since the shooting had not occurred where Allen said it had. He also questioned Allen's explanation of his flight out of fear of the decedent's friends, when Allen had stayed in the same place for two and one half months after the shooting, suggesting instead that Allen fled because he was afraid of not being believed. Further, the prosecutor argued, Allen had done "nothing to preserve what would support him," such as looking in the van for the shell casing, preserving the gun, and keeping in contact with Gerard or at least learning his last name.

would be for the trial judge, in the first instance, to consider whether the inference that Gerard would, in fact, have been willing to support Allen's self-defense claim was so prejudicial that the probative value of the question was extremely limited in view of a Fifth Amendment claim by Gerard. But it would not have been beyond the "permissible alternatives" available to the trial judge in the exercise of reasoned discretion, *Johnson, supra,* 398 A.2d at 365, to conclude that an innocent person in Allen's position would have attempted to locate Gerard to ask him to support Allen's story.

Had the trial judge so concluded, the appellate court would not find an abuse of discretion by the judge in allowing the prosecutor's cross-examination and closing arguments that focused on what Allen failed to do on the night of the shooting and shortly thereafter before he left for Miami, particularly since Allen was afforded an opportunity to explain his conduct. Thus, the prosecutor could properly have questioned Allen about whether he had (1) seen Gerard after the shooting and before he (Allen) went to Miami, (2) looked for Gerard, (3) asked his (Allen's) sister or brother-in-law about Gerard, (4) tried to find out Gerard's last name, and (5) asked Gerard if he would be willing to tell what had happened in the van.

Some of the prosecutor's other questions, however, when examined in terms of the factors underlying the consciousness of guilt inference, were improper. As Allen maintains, no consciousness of guilt inference could reasonably be based on his failure to look for the shell casing or to "scour" the van. Even one wholly innocent of crime would be unlikely to recognize the importance of looking for a shell casing or of preserving the van. Indeed, if Allen had preserved the van and the shell casing, their presence at trial would have been irrelevant. Neither the government witnesses nor Allen claimed that the decedent had fired into the van or damaged it. Moreover, it was undisputed that Allen had used a gun to shoot the decedent; finding a shell casing would have proved little in and of itself since it was the location of the

casing that was important, to show where the shooting took place. *Cf. Hale, supra,* 422 U.S. at 180, 95 S.Ct. at 2138 (post-arrest silence inherently ambiguous and potentially prejudicial; cannot be used for impeachment); *Sampson v. United States, supra note* 5, 407 A.2d at 576 (D.C.1979) (defendant's omission of material fact may not be used to impeach him, unless it is omitted from defendant's prior statement where "it would have been natural to mention" the material fact, and later testified to by defendant at trial); *Walker, supra,* 402 A.2d at 427 (failure to tell parole officer of reason for flight insufficiently probative to permit cross-examination); *Beale, supra* note 5, 465 A.2d at 805; *see also Hill, supra,* 404 A.2d at 531. Thus, consideration of the consciousness of guilt factors demonstrates that the trial judge erred by allowing cross-examination and argument about Allen's failures to look for the shell casing and to search the van.

### C.

The question, therefore, is whether the question suggesting that Allen had a burden to prove that he acted in self-defense and the cross-examination and closing argument about Allen's failure to look for the shell casing or to search the van were so prejudicial as to require reversal of his convictions. The answer turns on whether, in view of Allen's opportunity to provide an explanation for his failures to preserve evidence and his flight, the errors would have influenced the result reached by the jury. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

The single question on cross-examination suggesting that Allen had a burden to show he acted in self-defense was satisfactorily addressed in the judge's instructions to the jury. The instructions included the admonition to the jury that "[t]he law does not require the defendant to prove his innocence or to produce any evidence at all." Referring specifically to Allen's self-defense claim, the judge instructed the jury that Allen was "not required to prove that he acted in self-defense," and that the

government "must prove beyond a reasonable doubt that the defendant did not act in self-defense." [12] The judge gave the standard instructions on the credibility of witnesses and arguments of counsel. He also instructed the jury that:

> Flight or concealment by a person after a crime has been committed or after he's been accused of a crime may be motivated by a variety of factors which are fully consistent with innocence. Flight does not create a presumption of guilt nor does a person's flight or concealment necessarily reflect feelings of guilt. Furthermore, since innocent persons sometimes have feelings of guilt, such feelings do not necessarily reflect actual guilt.

> While you may consider flight or concealment as one circumstance tending to show feelings of guilt, and you may also consider feelings of guilt as evidence tending to show actual guilt, you are not required to do so. Under no circumstances may you presume a defendant's guilt from his flight or concealment alone. You should consider and weigh any evidence of flight or concealment by the Defendant in connection with all the other evidence in the case and give it such weight as in your judgment it is fairly entitled to receive.

Viewed in their totality, *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 1971–72, 85 L.Ed.2d 344 (1985), the instructions made clear the limited use of inferences arising from Allen's flight, and although not specifically addressing the cross-examination regarding Allen's failure to preserve evidence, this instruction was probably sufficiently broad to cover Allen's inaction as well. The evidence presented the jury with two conflicting interpretations, the government's version of events and Allen's explanation of why he did not look for Gerard or inside of the van. Admittedly, the reference in the instruction to "concealment" might have been interpreted by the jury to refer to Allen's failure to surrender himself to the police. But if an affirmative act like flight could not be the basis for finding Allen guilty, then a reasonable jury also would likely conclude from the instruction that ambiguous nonconduct, like the failure to ask about Gerard and to ask his relatives to keep the van, also could not be the basis for finding guilt. Furthermore, the judge instructed the jury that motivations depend on "a variety of factors which are fully consistent with innocence." *See McCowan v. United States, supra note* 12, 458 A.2d at 1197 (the jury is presumed to understand and follow instructions). In addition, the judge's immediate response—that Allen "doesn't have to prove" his innocence—after the prosecutor made the isolated comment mitigated the prejudicial effect on the jury of the improper questioning and argument. *Cf. Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) (a court should not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning").

Likewise, the prejudice from the improper cross-examination about the shell casing and van was mitigated, in part, by defense counsel's closing argument, which stressed the weakness and unpersuasiveness of the consciousness-of-guilt inference. Defense counsel suggested that the jury should consider the fact that the police could not find

---

**12.** Allen's contention that the prosecutor's cross-examination and closing argument shifted the burden of proof on self-defense to Allen is unpersuasive. *See McCowan v. United States,* 458 A.2d 1191, 1197 (D.C.1983) (distinguishing between closing argument pointing to the defendant's unreasonable limited attempts to ascertain where he was on the date at issue and a claim that the defendant had the burden to prove his whereabouts) (citing *Whalen v. United States,* 379 A.2d 1152, 1165 (D.C.1977) (prosecutor's argument, referring to defendant's pretrial inability to explain where a co-worker was, was proper as rebuttal to the defense argument, and

not a comment on the defendant's failure to testify), *rev'd on other grounds,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)). Here, the prosecutor was focusing on the unreasonableness of Allen's claim that he acted in self-defense. Furthermore, in rebuttal closing argument, the prosecutor stated that he agreed with the defense counsel's statement during closing argument that the government had the burden of proof. The jury is presumed to follow the instructions, and there is no evidence that it did not do so. *See Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

the second shell casing, and that the shell casing they found was under a piece of newspaper and no one claimed Allen or the decedent had newspaper in their hands. In other words, the shell casing could have been anywhere, and finding it would not have helped Allen's self-defense claim one way or the other.

Accordingly, in view of the proper impeachment by cross-examination (including that relating to Allen's flight and attempt to create a new identity), Allen's testimony offering an explanation for his failure to preserve evidence, and the strength of the government's evidence,[13] I conclude, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]," *Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. at 1248, and I join in voting to affirm the judgment of convictions for manslaughter while armed and carrying a pistol without a license.

TERRY, Associate Judge, concurring:

I join my colleagues in voting unanimously to affirm the judgment of conviction, and I join in the separate opinion of Chief Judge Rogers in its analysis of the issues which this case presents. I write separately only to note my ardent endorsement of what Judge Schwelb has said in part II–B of his opinion, *ante* at 1223–1225.

From time to time over the past several years, various appellants have argued before this court that a prosecutor, in closing argument or perhaps in the wording of a question, has somehow "shifted the burden of proof" to the defendant. To me such an argument is inherently absurd. Neither prosecutors nor defense attorneys have anything to do with allocating or "shifting" the burden of proof in a criminal trial. That is the task of the judge, and in this jurisdiction our trial judges perform that task very well when they instruct the thousands of juries that come into their courtrooms each year. A standard instruction, given in all criminal trials in the District of Columbia, tells the jury that the government has "the burden ... to prove the defendant guilty beyond a reasonable doubt" and that "this burden of proof never shifts throughout the trial." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.08 (3d ed. 1978). It is from this instruction and others like it, *given by the judge*, that the jury learns about the burden of proof. I simply cannot see how something said by counsel in the course of a trial could somehow mislead twelve reasonable jurors into believing, contrary to what the judge expressly tells them, that the defendant has any burden at all to prove his or her own innocence—especially when the jury is also told, "The function of the court is ... to instruct you as to the law which applies to this case. It is your duty to accept the law as the court states it to you." *Id.*, No. 2.01. If a prosecutor even hints to a jury that the defendant has some burden of proof,[1] an alert trial judge will intervene immediately, as the judge in this case did, *ante* at 1224 n. 8, and tell the jury that the defendant has no such burden.

In arguing that the prosecutor's questions and argument impermissibly shifted the burden of proof to the defense, appellant relies on such cases as *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), in which the instructions given *by*

13. The government's evidence showed, in part, that after Allen and the decedent left Annie Johnson's apartment, a gunshot was heard. Annie Johnson saw Allen push the decedent but did not see anything in Allen's hands. However, when she heard a second shot she saw fire coming from Allen's hand and the decedent staggering. Felicia Baldwin saw Allen fire the second shot at the decedent and watched the decedent stagger into the apartment building, where he collapsed on the second floor. The decedent fell into George Davis' apartment door; Davis did not see a gun in the decedent's hands. Allen followed the decedent to the front steps of the apartment building, and prepared to shoot again, but then turned and ran. Allen and an unidentified man (Gerard) got into the van and drove away.

1. Other than, of course, the burden of proving an affirmative defense such as insanity. *See* D.C.Code § 24–301(j), last sentence (1989).

*the court* were held to have shifted or misallocated that burden. To me it is an illogical and unwarranted leap to suggest, on the basis of these and similar decisions, that some statement *by counsel* has the same effect. Courts often recognize that words coming from a judge's mouth have a far greater impact on the jury, and must therefore be assessed more strictly, than the remarks of a mere attorney. For example, in *Burgess v. United States*, 142 U.S.App.D.C. 198, 207, 440 F.2d 226, 235 (1970), the court drew a distinction between a missing witness argument and a missing witness instruction:

> Argument of counsel is on quite a different legal level from an instruction of the court granting to the jury the right to draw the inference of unfavorable testimony. Such an instruction has the weight of law, even when it only permits

and does not require the inference, whereas counsel's argument is only that.

*See also McGrier v. United States*, 597 A.2d 36, 46 (D.C.1991) (finding an "obvious" and "critical" difference between instruction by court and argument by counsel saying the same thing). No comment by counsel can ever have the "weight of law" behind it, because counsel can never speak with the authority of the court. Appellant's failure to acknowledge this obvious fact substantially undermines his claim of error.