## Richmond

BERNARD SKIPPER v. COMMONWEALTH OF VIRGINIA.

March 15, 1954.

Record No. 4217.

Present, Hudgins, C.J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Harold B. Singleton* and *Lucian H. Shrader*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Thomas M. Miller, Assistant Attorney General*, for the Commonwealth.

HUDGINS, C.J., delivered the opinion of the court.

Bernard Skipper, a negro 20 years of age, was convicted of rape of a white woman 46 years of age and sentenced to confinement in the penitentiary for thirty years.

The evidence for the Commonwealth may be summarized as follows: On September 22nd, 1952, at approximately 3:00 A. M. the prosecutrix returned to her apartment in Lynchburg after a two weeks' visit to Richmond. She turned on the lights and opened the windows in the living room, the large bedroom and kitchen, but at the moment did not go into the small bedroom. While seated at a desk in the living room, reading her mail, she heard someone walking in the hall. She could not see the person from where she was sitting, and thinking it was the occupant of an adjoining apartment, did not go into the hall to see who it was. A few minutes later she started into the small bedroom and as she entered the doorway a man grabbed her from the side. She screamed several times but her assailant "grabbed" her mouth and nose, "a horrible tussle ensued", she was thrown on the bed and in describing what followed, said, "I knew that he was very strong, I was absolutely powerless against him, because he was holding one of my arms down in this way and the other arm had me in some way, had my mouth and nose . . . . he had me smothered . . . . I could not do one thing to get away from him. I had hollered and I did not hear a sound any place." Under these circumstances she stopped struggling after defendant told her he was not going to hurt her.

After the man had accomplished his purpose and was adjusting his clothes, he was between his victim and the lights from the street and from the other room, which gave her a good view of him. She said that his shoulders were broad and his hands extremely large, his complexion was not very dark, and his suit was dark.

In the struggle the prosecutrix received an abrasion on her nose, several bruises and abrasions around her lips and a bruise "about an inch in diameter" on her lower abdomen. Immediately after the assailant left the prosecutrix' apartment she called her brother-in-law, Hugh Jackson, who lived in Bedford County about five miles away. He notified the police immediately, and with his brother and two policemen reached the apartment between 3:40 and 4:00 o'clock A. M. The police officers and Hugh Jackson testified that the prose-cutrix was very nervous, upset, crying and hysterical. One corner of the bed had fallen to the floor, the bedclothes were disheveled and "balled up" and there was other evidence tending to show that a terrific struggle had taken place in the small bedroom.

The prosecutrix testified positively that Bernard Skipper, the defendant, was her assailant.

This evidence, if believed by the jury, clearly justifies the conviction and if no error had been committed on the trial, it would be affirmed.

Defendant pleaded not guilty but did not take the stand in his own behalf. However, he contends that notwithstand-ing his positive identification by the prosecutrix, his identity as the criminal agent was not established beyond a reasonable doubt. This contention is based in part upon the testimony of three witnesses introduced by him tending to prove an alibi, and in part upon evidence introduced by the Commonwealth.

Isaiah Varley, a taxicab driver, testified that a few minutes before 2:00 A. M. on September 22nd, 1952, he drove de-fendant in his cab from a downtown area to his home where defendant got out of the cab and went into his house. Ethel Mae Skipper, defendant's 17 year old wife, and Patsy

Robinson, his mother, testified that the defendant arrived at their home in a cab at five minutes after 2:00 A. M. on the morning in question, and stayed there the rest of the night. Ethel Brandon, defendant's wife's grandmother, testified that defendant did not own a dark suit until October 3d when she helped him buy one.

In addition to the evidence tending to establish an alibi, defendant relies upon the following evidence introduced by the Commonwealth tending to show he was not the criminal agent.

Prosecutrix testified that so far as she knew no other negro man had been in her apartment. Strands of pubic and head hair found on the sheets of the bed upon which the crime had been committed were compared by the Federal Bureau of Investigation with strands of pubic and head hair of the defendant. No indentification was effected.

On cross examination prosecutrix admitted that prior to the trial she had said that her assailant was a "light skinned person." It is stated in the defendant's brief, and not denied, that defendant in fact is "very black." The prosecutrix failed or refused to identify the accused to the police officers at the police station on October 3d, eleven days after the crime was committed.

The evidence favorable to defendant is sufficient to warrant a verdict of acquittal. This conclusion requires a careful consideration of the rulings, conduct and remarks of the court during the progress of the trial.

■ Defendant contends that the court committed reversible error in permitting, over his objection, the prosecutrix to testify that twice before the trial she had made prior statements to the effect that defendant was her assailant and in permitting her to tell the jury why, on October 3d at the police station, she refused to inform the police officers that she recognized defendant as her assailant.

On direct examination prosecutrix testified that on October 3d, eleven days after she had been ravished, she, at the

request of the police officer, went to the police station where she saw the defendant. She was asked:

"Q. At that time did you identify him as being the man who had raped you on the morning of the 22nd of September?

"A. I identified him within myself instantly, yes.

"Q. Did you so advise the police officers and the authorities there who were interrogating you at that time?

"A. No, I did not.

"Q. Now, I want you to state to the jury in your own words just exactly why you did not identify him on that occasion. . . .

"A. I did not disclose the fact to the police officers because I did not want all of the publicity that goes with a trial and I figured that all had been done to me that could be and it was only under extreme pressure from my brother-in-law. They had brought the police and I could do nothing about it. That is why I called them instead of the police to begin with". . . .

On October 13th, ten days later, a police officer requested prosecutrix again to go to the police station for the purpose of identifying defendant who had been arrested again. She testified that before going to the police station, and without having seen defendant since October 3d, she told her brother-in-law that the defendant was her assailant. An objection was interposed to the evidence on the grounds that it was a "self-serving declaration and it was hearsay". The Court in overruling the objection said:

"The Court: I do not see that it is anything self-serving on the part of the witness in explaining why it was that though she immediately upon seeing him for the first time after the attack says that she then knew he was the man, she did not tell it because she was trying to avoid the publicity of a trial and the publicity about the matter, and this, gentlemen, is following up that explanation as to who and where did she first tell somebody that she knew he was the man. I believe that is proper examination and I will permit the question to be asked."

On cross examination defendant attempted to prove by the prosecutrix that it was too dark in the bedroom where she was attacked for her to see her assailant well enough to describe him accurately, or to identify him if she saw him again.

The Commonwealth on redirect examination of the prosecutrix asked her . . . . "what statement you made to Sergeant Harvey on October 3d after he had driven you to your home, your farm in Charlotte County, following the opportunity which had been afforded you on that same date to see this defendant, Bernard Skipper, at the Police Station here in the City of Lynchburg" . . . . The court in overruling defendant's objection said: "Ladies and gentlemen of the Jury, the witness' answers to that are not to be accepted by you as being the truth as to whatever she said. It is simply a fact whether she did make a statement and what the statement was, not that the statement was true. You must not consider the truth of what she said but the fact that she did say it. You may answer the question."

"A. After I was out of the car at my home I told Mr. Harvey he need not look any further."

The case presents an unusual situation. The prosecuting witness testified that the first time she saw defendant, after the assault, she recognized him but refused to make known her identification or denied that he was her assailant. Later, on the same day, she told one of the officers, who had questioned her, that defendant was her assailant. Her refusal to make known her identification of defendant or her silence at the police station is inconsistent with her testimony. She admitted this inconsistency and gave her reasons for her silence or failure to identify the accused when it would have been natural for her to have done so. A failure to assert a fact when it would have been natural to assert it amounts in effect to an assertion of the non-existence of the fact. Such conduct is *prima facie*, an inconsistency. Wigmore on Evidence (3d ed.) sec. 1042, p. 733. This inconsistency, unexplained, has a tendency to discredit the witness. "The

force of a contradictory statement must depend very materially upon the circumstances under which it was made and the influences at the time bearing upon the witness. It would therefore seem to be self-evident that witnesses so situated should be permitted to make such explanation as might be in their power. The first impulse of the mind in such a case is to inquire how this happened, what reason can be given, and more especially what can the party implicated say in excuse or extenuation. To refuse the opportunity to explain would be in effect to condemn a party without a hearing, and without that information which in many cases would be material to a correct judgment." *State* v. *Reed*, 62 Me. 129, 146, quoted with approval in 3 Wigmore on Evidence (3d ed.), sec. 1044, p. 738.

The general rule is that prior unsworn consistent statements of a witness are regarded as self-serving declarations and are inadmissible for the purpose of fortifying a witness' own testimony. 20 Am. Jur., Evidence, Sec. 458, p. 404. The reason usually given for the exclusion of such statements is that they are self-serving and may have been fabricated for the purpose for which it is sought to introduce them. When the reason for the exclusion ceases, the rule itself should not apply. 58 Am. Jur., Witnesses, Sec. 820, p. 459. We said in *Butler* v. *Parrocha*, 186 Va. 426, 435, 43 S. E. (2d) 1, 6: "The general rule is that declarations of a witness made out of court are not admissible evidence for the purpose of corroborating his testimony in court. One exception to this general rule is that such declarations are admissible to contradict evidence tending to show that a witness' testimony on the stand is a fabrication of recent date. Under such circumstances, prior consistent statements are admissible if such statements were made at a time when their ultimate effect and operation could not have been foreseen." See *Ben Rogers* v. *State of Arkansas*, 88 Ark. 451, 115 S. W. 156, 41 L. R. A. (N. S.) 857, Note p. 949.

At the time the prosecutrix refused or declined to identify defendant, and at the time she told the officer he was her

assailant, she claims she did not intend to appear against him or to prosecute him. Her explanation for her refusal or silence when it appears it would have been natural for her to speak, and her prior consistent statements were, under the circumstances, matters affecting her credibility, and were proper matters to be so considered by the jury. But the jury should have been left free to consider them, uninfluenced by the opinion, conduct, or remarks of the court.

It appears that two days before this case was tried in the lower court, defendant was tried and convicted on two separate indictments, one charging burglary with intent to commit rape upon a negro girl under the age of sixteen years. Both crimes were alleged to have been committed on October 12th, 1952, the day before prosecutrix made known her identification to the police officers. The two charges were matters of record and doubtless well known to the people in that locality These were the circumstances when on completion of direct and cross-examination of the prosecuting witness, the court took over her examination and the following ensued:

"Q. What led you on that later date, I believe the 3d was the first time you saw the prisoner after the offense and then the later date was the 13th, to disclose to the Police that you were satisfied this was the man, whereas previous to that time you have stated that your reason for not doing it immediately was because you wanted to avoid the publicity and prosecution and trial? What led you, if anything, between the 3d and 13th, some ten days later, to change in your attitude toward being willing to disclose your identification of the prisoner? Did anything occur between those two periods to make a change in your attitude?

"A. Yes, sir, there was.

"Q. Without going into detail, indicate to us why on the 13th of the month you were willing to then disclose the fact you knew who the man was?

"A. They came back to my house on the 13th, which I think was on Monday. I was supposed to come through the

City on that date. I hoped to try to work again. At this time I had planned to talk to Hugh Jackson and he was supposed to come to my house on Sunday.

"Q. Your brother-in-law?

"A. And talk about how I felt about it, about the whole thing. I did on that morning at the Police Court before I told them then. A young officer came to my house and said that they had picked this boy up again and that there had been some misconduct.

"Mr. Singleton: I object to that.

"The Court: Don't go into details. Was there something to produce a change in your mind or attitude?

"A. If this person is going to offend other people in society, we can't live in the world.

"Mr. Singleton: We object—

"The Court: The Court is doing the examining. You will please not interrupt the Court. The Court is going to give you an opportunity to object. I want this witness to answer in the interests of justice and fairness, with all due respect to you and the rights of the prisoner, and I propose to develop it.

"By the Court:

"Q. Without your going into the particulars of what was said, or the circumstances, you became convinced, if I understand you, that in the public interest you should make the disclosure.

"A. Yes, I definitely did.

"Q. Now I think that is as far as the Court is going. If you wish to develop any details, I am going to permit you.

"The Court: On behalf of counsel for the prisoner, note that counsel objects to the questions the Court has asked and the answers of the witness thereto and takes exception to all of it."

The court was courteous to defendant's attorney and gave him full opportunity to note his objections, which was done. However, the court in its previous ruling and in the first question quoted above, repeated and emphasized the reasons

stated by the prosecutrix for her failure or refusal to identify the accused on October 3d. This repitition and emphasis by the trial judge probably induced the jury to believe that the judge thought that the prosecutrix' explanation of her inconsistency was credible and should be accepted. This opinion of the judge is further emphasized by his statement made in the presence of the jury: "I want this witness to answer in the interest of justice and fairness, with all due respect to you and the rights of the prisoner, and I propose to develop it."

A trial judge has a right, indeed it is his duty, when necessary for the fair, orderly administration of justice, to participate in the trial and facilitate its progress. But such participation should be impartial and not prejudicial to either the prosecution or the defense. A charge of rape not infrequently arouses passion and prejudice, hence a trial of such a charge should be conducted with the greatest care and with scrupulous fairness in order to avoid the possibility of the jury being influenced by such passion and prejudice.

The able and experienced trial judge in this case in his examination of the prosecuting witness unconsciously, no doubt, revealed to the jury his own opinion of her credibility, which was highly prejudicial to defendant.

In addition, in some of the questions and replies, allusion was made to other crimes alleged to have been committed by defendant. Indeed the witness in reply to the judge's question in effect said, that one of the reasons which induced her to change her mind about identification of the accused, was the fact that he had been charged with other crimes. This may have been true, but allusion to defendant's conviction of other crimes was prejudicial to him in this trial.

Judge Burks' statement in *Mazer* v. *Commonwealth*, 142 Va. 649, 653, 123 S. E. 514, quoted with approval in *Willis* v. *Commonwealth*, 183 Va. 125, 132, 31 S. E. (2d) 306, 308, is pertinent to the question under consideration and is as follows: "The high official position of the trial judge in a criminal case gives great weight, with the jury, to his words

and conduct, and it is incumbent upon him to guard against any manifestation of his opinion either upon the weight of the evidence or the credibility of the witnesses. 'All expressions of opinions, or comments, or remarks, upon the evidence, which have a tendency to intimate the bias of the court with respect to the character or weight of the testimony, particularly in criminal cases, are watched with extreme jealousy and generally considered as invasions of the province of the jury.' *DeJarnette* v. *Commonwealth,* 75 Va. 867, 874."

The identification of defendant was the dominant issue in the case. This indentification rests solely upon the testimony of the prosecutrix. The force of her identification was weakened by her prior inconsistent statement. In order for the jury to have believed her testimony as to the identity of defendant, it was necessary for them to accept her explanation of her inconsistency. This they had a right to do, uninfluenced by the conduct or comment of the trial judge. The conduct, questions and remarks of the trial judge indicated that in his opinion the explanation of the prosecutrix' inconsistency was credible and should be accepted by the jury. Such being the situation disclosed by the record we cannot say that the defendant has had a fair and impartial trial.

We find no merit in the other assignments of error and deem it unnecessary to discuss them. The judgment is reversed, the verdict of the jury is set aside, and the case remanded for a new trial not in conflict with the views herein expressed.

*Reversed and remanded.*