Lewis LYONS, Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–1145.

District of Columbia Court of Appeals.

Argued March 18, 1992.
Decided March 16, 1993.

---

10. D.C.Code § 4–142 (1988); 6A DCMR § 200.4 (1988).

**36**

Stephen I. Singer, Public Defender Service, with whom James Klein, L. Page Kennedy, and Jo–Ann Wallace, Public Defender Service, were on the brief for appellant.

Philip S. Kushner, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese III, and David Schertler, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and WAGNER, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of first degree murder while armed, D.C.Code §§ 22–2401, –3202 (1989 & 1991 Supp.), assault with intent to kill while armed, *id.* at §§ 22–501, –3202, assault with a dangerous weapon, *id.* at § 22–502, and carrying a pistol without a license, *id.* at 22–3204. Appellant contends the trial court erred when it (1) permitted the government to cross-examine him about his positive urine test for PCP administered five days after the shooting and (2) allowed, under the spontaneous utterance exception to the hearsay rule, the testimony of a police officer who recounted a government eyewitness's lengthy statement to the officer. Appellant also alleges three instances of prosecutorial misconduct, arguing that the government improperly impeached him with his post-arrest silence, his pre-arrest silence, and a prior inconsistent statement the government failed to disclose to the defense before trial. While we address appellant's three claims of improper impeachment and agree with appellant on two of them, we need not assess the prejudice from these improprieties because we reverse appellant's convictions on the first two grounds and remand for a new trial.[1]

**I.**

Lionel Harris was shot and killed on March 12, 1988. At trial, appellant admitted he had shot Harris but maintained he had shot him in self-defense. Appellant's first trial ended in a mistrial because the jury was unable to reach a unanimous verdict.

On the afternoon of March 12, Harris and his friend, Kent Jones, drove out to Hains Point, where they each drank three beers and had a half pint of cognac. Then they drove to the parking lot of Peoples Drug in Georgetown, parked, and walked down Wisconsin Avenue. After eating and placing a phone call, the two walked by a record store in which Jones saw Carlette Watkins, whom Jones recognized from junior high school. According to Jones's testimony, after he and Harris entered the store, he approached Watkins and said, "Hi, how you doing?" When Watkins did not respond, Jones asked her if she remembered him, and she replied she did not. Jones testified that appellant, standing three or four feet away, gave him "a mean look," at which point Jones suggested to Harris that they leave. They walked back to the drugstore parking lot.

According to Jones, as he and Harris were standing in the lot urinating, appel-

---

1. We address all of appellant's claims of improper impeachment because the evidentiary issues on which they are based are likely to arise again during retrial.

lant and Watkins walked into the lot and passed them. As Appellant walked over to his car, Watkins said, "Don't do it, don't do it." At the car, appellant pulled out something long and silver that he stuffed into his pants. After Watkins sat down in the car, appellant approached Jones and Harris, and Jones said, "I know her, I was just speaking to her and that's all." Appellant responded, "No, no you don't know her," and fired a shot at Jones from fifteen to twenty feet away. The bullet missed. Appellant ran over to the driver's side of Harris's car, where Harris was sitting, and began hitting Harris in the face with the gun. At that point Jones ran out of the lot to get help but bumped into a man later identified as appellant's friend, Ivan Jones ("Whitey"). Kent Jones said Whitey tried to grab him and punched him in the side of the head. When Kent Jones returned to the parking lot a few minutes later, he found Harris lying and bleeding on a nearby sidewalk. Jones claimed that neither he nor Harris had a gun that night and that he had never seen Harris with a gun.

The government also called Whitey as a witness. He testified that, after leaving the record store, he had heard a noise "like a firecracker." As he walked to the lot he bumped into a man (Jones) who was running. When Whitey reached the lot he saw appellant and Harris fighting. Whitey tried to break it up, appellant pushed him away, Whitey continued to the car, and appellant followed soon thereafter. Appellant did not tell him or Watkins what had happened, but a few days later appellant told Whitey that Harris had "disrespected [his] girlfriend."

Jonathan Maxson also testified for the government. He said that he was sitting in his car in the drugstore parking lot when he heard a gunshot. Two men ran in front of his car, one of whom—later identified as appellant—had a gun. Appellant pointed the gun at Maxson, who accelerated his car to hit him. When appellant jumped out of the way, Maxson drove off to find a policeman. When the police arrived on the scene, Harris was lying on the sidewalk, dead.

Appellant Lyons testified in his own defense, claiming that he had shot Harris in self-defense. Appellant said that he, Watkins, and Whitey had gone into the record store so that Whitey could buy a tape. As appellant and Whitey were waiting at the front counter, Whitey informed appellant that two men were bothering Watkins at the rear of the store. When appellant walked over to Watkins, she told him that Jones and Harris had been following her around. By that time Jones and Harris were leaving the store. After a few minutes, Lyons saw Whitey at the counter purchasing his tape, so he and Watkins decided to head for their car, which was parked in the Peoples Drug parking lot.

According to appellant, Jones and Harris harassed him and Watkins as they made their way to the car. After Watkins had gotten into the car, Jones and Harris continued to swear at them. Appellant then approached the two. An argument developed, and Harris came toward appellant with a gun. Appellant was able to knock the gun to the ground. He and Harris went for it, appellant got to it first, and, as Harris came toward him, appellant fired one shot, which hit Harris. After Harris fell to the ground, appellant ran back to his car and fired a shot at another car that he believed was coming at him. Appellant jumped out of the way of the car. By this time Whitey had returned to the lot; he helped appellant back to his car. Appellant drove home, and, after realizing he still had the gun, he threw the gun down a sewer.

Carlette Watkins, for the defense, testified that she had not seen a gun in appellant's car that day and that appellant had not shown her a gun that night. When she and appellant left the record store and entered the parking lot, Jones and Harris smiled at her and "wriggl[ed] their penises." She and appellant kept walking to their car as Jones and Harris repeatedly called her a "bitch." After appellant unlocked the car door for Watkins, she believed he was mad enough to start a fight with them. He left the car and approached Jones and Harris with only his keys in his hand. As the three men argued, Watkins turned on the radio loudly enough so that

she could not hear them. The car was facing the wall so Watkins could not see or hear anything. When appellant returned to the car with Whitey a few minutes later, he was quiet and refused to tell her what had happened.

Several days later, after he heard from his parents that the police were looking for him, appellant turned himself in to the police. One day after his arrest and five days after the shooting, appellant's urine tested positive for PCP.

## II.

We first address appellant's three complaints of prosecutorial misconduct. Initially, we conclude that appellant's complaint that the prosecutor commented on his post-*Miranda*[2] silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) has no merit.[3] His other two complaints of misconduct, however—the prosecutor's impeachment of appellant both with his pre-arrest silence and a prior inconsistent statement the government failed to disclose to the defense before trial—have merit.

## A.

■ On cross-examination, the prosecutor—over objection that was immediately overruled in each instance—repeatedly asked appellant why he did not tell his friends, Watkins and Whitey, in the car immediately after the shooting that he had acted in self-defense (as he had testified on direct) when they asked "what happened." Appellant replied he was "scared to death." The prosecutor then highlighted in closing argument appellant's failure to explain to his friends what had happened, reflecting a proffered inconsistency with his later self-defense testimony at trial. The government argues that such impeachment by "omission" was proper under our line of cases beginning with *Hill v. United States*, 404 A.2d 525, 531 (D.C.1979) (per curiam), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980). We disagree. Although it is appropriate to give a prosecutor leeway to inquire into a testifying defendant's state of mind surrounding an incident for which the defendant has claimed self-defense, we conclude that, in this case, the trial court erred in allowing the government, over objection, to impeach appellant with his failure to tell his friends his version of events immediately after the shooting and to explain to them that he had acted in self-defense.

In *Hill* the defendant, claiming self-defense, testified at trial that he had heard gunshots and that the decedent had come running toward him carrying a pistol. *Hill*, 404 A.2d at 531. In his statement to

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Appellant argues that the prosecutor commented on his post-*Miranda* silence in the following exchange during cross-examination:

Q: And isn't it true that after that lineup, on March 23rd, a week after you talked to the police, you never said anything about self-defense—

[Defense Counsel]: Objection.

[Trial Court]: Go ahead. Objection overruled.

Q: Isn't it true one week after you had been in the police station where you never said anything to those detectives about self defense—

[Defense Counsel]: Your Honor, this is not a question. This is a statement and a restatement.

[Trial Court]: The objection is overruled, Mr. Horton.

Q: Isn't it true that one week after you had been in there with the detectives, when you by

your own admission said you never said anything about self defense, that you went to a lineup and you walked out of the lineup and your lawyer told you that two people had identified you in the lineup as the man with the gun at the shooting; isn't that right?

Although the prosecutor's first question was poorly phrased so that it appeared as if he was questioning appellant about his silence at the time of the lineup when appellant's right to counsel had already attached, the prosecutor corrected himself after defense counsel's timely objections (although the court had overruled the objections). The third (the complete) question makes clear that the prosecutor merely meant to emphasize what he had already been emphasizing throughout his cross-examination: appellant's failure to tell the police—before invoking his *Miranda* rights—that he had acted in self-defense. We discern no harm in the prosecutor's slip of the tongue.

the police after receiving his *Miranda* [4] warnings, however, he had failed to mention these two exculpatory facts. The prosecutor impeached the defendant with his failure to mention such important details when he voluntarily told the police, soon after arrest, what had happened. On appeal, he claimed that the prosecutor had "unconstitutionally impeached his testimony by calling attention to his post-arrest silence." *Hill,* 404 A.2d at 529 (footnote omitted).

■ Distinguishing *Doyle, supra,* and *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), this court held that if the trial court, in the exercise of its discretion in determining admissibility of impeachment evidence, finds that a defendant's voluntary pretrial statement " 'fails to mention a material circumstance' " which the defendant mentions at trial but which also " 'would have been natural to mention in the prior statement,' " the prior statement constitutes a prior inconsistent statement which the government may use to impeach the defendant at trial. *Hill,* 404 A.2d at 531 (quoting E. CLEARY, MCCORMICK ON EVIDENCE, § 835 at 68 (2d ed. 1972)); *accord Martin v. United States,* 452 A.2d 360, 363 (D.C.1982); *see also Outlaw v. United States,* 604 A.2d 873, 879 (D.C.1992). More specifically, *Hill* requires the following three-part test for admissibility of an omission as a prior inconsistent statement:

[1] The pretrial statement to be admissible for impeachment purposes should purport to address the facts surrounding the commission of the alleged offense. [2] The prosecutor ... must apprise the trial court of the omitted facts to be relied upon as showing inconsistency and [3] the court must consider whether such facts are sufficiently material that the failure to have mentioned them amounts to inconsistency.

*Hill,* 404 A.2d at 531 (bracketed numbers added).

**4.** *See supra* note 2.

**5.** The one exception is *Walker v. United States,* 402 A.2d 424, 427 (D.C.1979), where the alleged

■ Thus, absent a threshold trial court finding of a material inconsistency, a defendant's pretrial failure to state a fact that he or she later states at trial "may not have the probative value which would allow its admission at trial for impeachment purposes." *Martin,* 452 A.2d at 363. Once the trial court finds a material omission and allows the government to use it to impeach the defendant, however, the jury may then consider the inconsistency in judging the defendant's credibility.

In some cases we have concluded that, even though the defendant had made a brief statement to a government official (almost always a police officer), the government failed to meet its burden of showing that it would have been natural for the defendant to have provided the officer with all the details the defendant later provided at trial. *See, e.g., Walker v. United States,* 402 A.2d 424, 427 (D.C.1979); *Sampson v. United States,* 407 A.2d 574, 579 (D.C.1979) (per curiam); *Martin,* 452 A.2d at 363–64; *Beale v. United States,* 465 A.2d 796, 805 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *see also Outlaw* 604 A.2d at 879. In other cases, we have upheld the trial court's finding of a material omission because it would have been natural for the defendant to note in his or her statement to a police officer the details the defendant later included in trial testimony. *See, e.g., Hill,* 404 A.2d at 532; *Ford v. United States,* 487 A.2d 580, 587 (D.C.1984); *Dixon v. United States,* 565 A.2d 72, 79–80 (D.C.1989).

■ Under *Hill* and its progeny, a material fact is "natural to mention" when a person purports to give a complete account of "the facts surrounding the commission of the alleged offense." *Hill,* 404 A.2d at 531. Moreover, in this court's previous criminal cases involving alleged material omissions and their admissibility for impeachment purposes, with one exception the defendant had made his or her pretrial statement to a police officer.[5] WIGMORE, on

material omission arose in a conversation the defendant had with his probation officer.

which we relied in *Hill,* 404 A.2d at 531, lists several categories of cases where courts have found that a defendant failed to assert a fact "when it would have been natural to assert it." 3A WIGMORE, EVIDENCE § 1042 at 1056 (Chadbourne rev. 1970) (emphasis deleted). Such cases include those where defendants have made "[o]missions in *legal proceedings* to assert what would have been asserted naturally under the circumstances," or "[o]missions to assert anything, or to speak with such detail or positiveness, *when formerly narrating,* on the stand or elsewhere, the matter now dealt with [at trial]. *Id.* at 1056–57 (emphasis in original) (footnotes citing cases omitted); *see also* J. STRONG, 1 McCORMICK ON EVIDENCE § 34, at 114–15 (4th ed. 1992) ("[I]f the former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent" for the court to allow impeachment.). In sum, the WIGMORE standard for impeachment by pretrial material omission we adopted in *Hill*—and which we have consistently applied in subsequent cases—requires that the defendant must have made the alleged omission in what appears to have been a complete statement of events surrounding the crime, typically in response to questioning by a police officer.[6] Absent such context in which a

speaker purports to tell all for a discernible reason, it is too speculative to say it would have been "natural" to state an omitted fact.

There are good reasons for this limitation. For example, in this case immediately after the shooting, neither Watkins nor Whitey accused appellant of shooting Harris; they simply asked appellant "what happened." He declined to tell them, neither admitting nor denying the shooting. He had no obligation or other discernible reason to say anything. In this context, therefore, where appellant had neither been accused of nor admitted the crime— and he was not purporting to give a complete account of what had happened, as in a statement to the police—it would not have been "natural" for him to have volunteered a reason *why* he shot the victim. Indeed as a general proposition, in contexts involving family, friends, or acquaintances, whether it would be "natural" for someone to mention all the details of a crime that he or she later mentions at trial would depend on a myriad of subjective, intangible factors that are not readily discernible given the many possible types of personal relationships—some close, others not so close. There may be any number of reasons why appellant did not tell his friends details about the shooting—even friends, as in this case, whom he admittedly trusted.[7] For

We note that in the present case the government, without objection, successfully impeached appellant with his failure to tell the police during interrogation—before appellant invoked his *Miranda* rights—that he had fired the gun in self-defense. That was impeachment by material omission under the *Hill* principle. If a suspect purports to give a full statement about the relevant incident during custodial interrogation, the situation falls squarely under the principles announced in *Hill.*

6. For example, in *Ford v. United States,* the appellant failed to mention during two hours of police questioning after her arrest that she had encountered the murder victim just hours before the victim had been killed, a detail she noted in her testimony at trial. 487 A.2d at 586. We reasoned that, because the appellant knew she was a suspect in a murder investigation, and having told the detective all that she did, it would have been natural to tell him also that she saw [the victim] on the day of his murder. We conclude that there was suffi-

cient inconsistency between that omission and her testimony at trial to make it permissible to allow the jury to determine its significance. *Id.* at 587.

In *Sampson v. United States,* on the other hand, the appellant waived his *Miranda* rights and made a brief exculpatory statement simply denying his participation in the crime he had described to the police. 407 A.2d at 579. We concluded that, because the appellant had "made to the police a general denial of involvement with and knowledge of the crime but [had] made no statement concerning his whereabouts at the time during which the crime was committed," the government "failed to establish a threshold inconsistency between appellant's prior statement at the police station and his later alibi defense at trial." *Id.*

7. In cross-examining appellant to lay a foundation for the questions about the prior silence at issue here, the prosecutor elicited from appellant that he trusted Whitey and Watkins.

example, he may have been trying to protect his friends by limiting their involvement, a motive wholly unrelated to the issue of his credibility at trial. Or, he may simply have been afraid. To permit a jury to draw an inference of guilt from a suspect's failure to tell friends "what happened" immediately after a shooting would be to permit rank speculation, to the severe prejudice of the accused, without corresponding probative value. *See United States v. Hale,* 422 U.S. at 176, 95 S.Ct. at 2136 ("In most circumstances silence is so ambiguous that it is of little probative force."); *cf. Jenkins v. Anderson,* 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980) (In federal courts, "prior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result.").

■ In contrast to the fact situations in all the cases the government cites in its brief and the additional ones we cite above, appellant in this case declined to answer questions posed by his friends—not by a police officer or government official—immediately after the incident and, therefore, at this time *did not make any statement at all.*[8] Appellant merely refused to respond to his friends' general questions of "what happened"; he did not take advantage of a pretrial opportunity to "go on record" to explain to a police officer or someone else what had happened. Nor is there a discernible reason of record why appellant would have been expected to volunteer information even to trusted friends in these circumstances.

We conclude, accordingly, that appellant's nonstatement to his friends fails to meet the foundation requirement of *Hill*

for establishing a material pretrial omission. Thus, there was no impeachable inconsistency between appellant's claim of self-defense at trial and his refusal immediately after the shooting to explain to his friends what had happened. The trial court therefore erred in allowing the prosecutor, over objection, to impeach appellant with the fact that he did not tell his friends immediately after the shooting that he had shot Harris in self-defense.[9]

### B.

Because appellant testified that he had shot Harris in self-defense, he admitted at trial that he had been present at the scene of the shooting. On cross-examination, the prosecutor attempted to impeach appellant with a prior inconsistent statement. After defense counsel's objection, the prosecutor proffered that appellant initially had told police he had not been in Georgetown on the night of the shooting. Defense counsel responded that the government had never disclosed that statement to the defense, despite the government's obligation to do so under Super.Ct.Crim.R. 16, and despite the fact that this was appellant's second trial. Although the trial court expressed concern over whether the government had failed to meet its obligations under Rule 16, at that time it refrained from making a clear ruling on defense counsel's objection.

Soon thereafter, the prosecutor again attempted to impeach appellant with his alleged statement to the police. Defense counsel again objected, but this time the trial court overruled the objection. When the prosecutor again posed the impeaching question, defense counsel objected and this time moved for a mistrial. At that point

8. These circumstances distinguish this case from the cases cited by our dissenting colleague. In both *Dixon, supra,* and *Hunter v. United States,* 606 A.2d 139 (D.C.), *cert. denied,* —— U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), divisions of this court found no reversible error where the government suggested, in closing argument, that the defendants had omitted relevant material from pretrial statements given to the police. In other words, both cases involved material omissions from accounts given to law enforcement officers, as opposed to mere silence before friends such as we have here. *Al-*

*len v. United States,* 603 A.2d 1219 (D.C.) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992), involved impeachment based upon appellant's failure to preserve evidence or obtain witnesses to support his claim to self-defense and, thus, is not germane to the issues in this case.

9. Given our disposition of this case in Parts III.–V., below, we do not reach the question whether the error was prejudicial enough to warrant reversal.

the trial court ruled preliminarily that the prosecutor could not go into that line of questioning until he could prove the government had previously disclosed the prior inconsistent statement to the defense.

The next day, the prosecutor admitted that the government had not disclosed the alleged oral statement, even though he now had a police officer who would testify that appellant had initially denied being in Georgetown that night. This time the trial court ruled:

> I think the defense is correct. Clearly the statement should have been turned over. That's number one. Number two, clearly it is not just disadvantageous but extremely prejudicial in that it is an outright denial of even being in Georgetown. I can't guess as to what the defense strategy would have been if they had known about the statement.

After the court's ruling, the prosecutor promised that he would "stay away from" questions intended to impeach appellant's trial testimony on the ground that appellant had initially denied being in Georgetown. Despite that promise, however, the prosecutor attempted to impeach appellant yet one more time with the same statement, whereupon the trial court sustained appellant's objection yet again.

 The government must disclose, upon defense request—as the defense requested in this case—the substance of any oral statement of the defendant in response to interrogation by any person the defendant knows is a government agent. *Rosser v. United States*, 381 A.2d 598, 604 (D.C. 1977); Super.Ct.Crim.R. 16(a)(1)(A). After such a request is made, the government has a duty to disclose a defendant's oral statement "in enough detail to minimize the undesirable effects of surprise at trial and otherwise contribute to the fair and efficient administration of criminal justice." *Thomas v. United States*, 444 A.2d 952, 953 (D.C.1982); *accord Smith v. United States*, 491 A.2d 1144, 1147 (D.C.1985). "Otherwise, the integrity of the criminal process cannot be preserved." *Smith*, 491 A.2d at 1147.

 Super.Ct.Crim.R. 16(d)(2) specifically grants the trial court discretion, among other things, to prohibit the prosecutor from using a defendant's statements as a sanction for not complying with 16(a)(1)(A) or any other part of Rule 16. This was the appropriate sanction chosen by the trial court. The prosecutor unquestionably acted improperly in attempting to use appellant's statement to impeach him without first assuring that someone from the U.S. Attorney's office had previously disclosed it to defense counsel. It was even worse for the prosecutor to attempt to impeach appellant with the statement after the trial court had ruled he could not do so.

Because we reverse and remand for a new trial on other grounds, *see* Parts III.–V., below, we need not decide whether the prosecutor's misconduct resulted in substantial prejudice requiring reversal. *See, e.g., Mitchell v. United States*, 569 A.2d 177, 183 n. 5 (D.C.), *cert. denied*, 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990) (setting forth "substantial prejudice" standard for reviewing claims of prosecutorial misconduct when defendant objected at trial). Furthermore, we leave it to the trial court to decide whether to allow the government to use the statement in a third trial, given the government's noncompliance with Rule 16 and the unexplained initial appearance of the statement sometime between the first trial and the prosecutor's cross-examination of appellant during the second trial. In deciding that issue, the trial court has considerable discretion under Rule 16(d)(2) to do "as it deems just under the circumstances" in order to preserve the integrity of the criminal adversary process. *See Smith*, 491 A.2d at 1147; *Cotton v. United States*, 388 A.2d 865, 869 (D.C.1978) (listing factors guiding trial court discretion in determining proper sanction, including degree of government bad faith or negligence).

### III.

#### A.

As part of appellant's self-defense theory at trial, Dr. Jeffrey Janofsky, an expert in forensic psychiatry, testified that Harris's

toxicology report showed that Harris had PCP and alcohol in his bloodstream at the time of his death. Dr. Janofsky stated that because PCP was in Harris's blood, it was affecting Harris's brain at that time, although it was impossible to tell what the exact effect was. The doctor did note that people under the influence of PCP exhibit a wide range of effects, the most common being extreme agitation or even violent and threatening behavior. He also testified that, in general, the drug has a significant effect on a person's judgment. In contrast to the immediate (though uncertain) effects indicated by a positive blood test for PCP, Dr. Janofsky testified on cross-examination that it is "fair to say" someone whose urine tests positive for PCP could have used the drug anywhere up to two weeks before the test.

The government requested permission to question appellant about his use of PCP, arguing that the positive test five days after the incident, coupled with Dr. Janofsky's testimony that PCP remains in the urine for up to two weeks, provided a sufficient evidentiary foundation. The defense objected and proffered that appellant would deny he had used PCP before or on the day of the shooting and that, therefore, there was no basis to allow the jury to infer that appellant was under the influence on the critical day.

Although agreeing with the defense "that there is certainly prejudicial impact from presenting this testimony or this evidence to the jury," the trial court determined that there was a sufficient foundation and that the probative value of such testimony outweighed its prejudice, because one of the main issues in the case was whether appellant or Harris "was the aggressor." The court, however, limited the scope of the prosecutor's questioning and told him to ask his questions in the following order: (1) was appellant under the influence of PCP at the time of the offense? and (2) did appellant test positive for PCP five days later? Only if appellant answered "no" to the second question could the prosecutor attempt to impeach appellant with extrinsic evidence of the drug test.

The prosecutor, however, asked the following series of questions:

Q: Well, Mr. Lyons, you fired the gun; didn't you?

A: Well, my hand was on the trigger, yes it was.

Q: And you purposefully fired the trigger?

A: No, I didn't purposefully fire the trigger.

Q: First of all, Mr. Lyons, you tested positive for PCP on March 17, 1988.

At that point defense counsel objected. The trial court sustained the objection and told the prosecutor to ask the questions in the properly agreed upon order. The prosecutor then asked appellant:

Q: Mr. Lyons, you were under the influence of PCP on March 12, 1988, the day that young man was shot; weren't you?

A: No, I wasn't.

Q: But you did test positive for PCP five days later on March 17, 1988 when you were arrested and brought into court; didn't you?

A: Yes, sir.

Q: Had you used PCP prior, Mr. Lyons, prior to the night of that shooting in a two-week period prior to the night of the shooting?

A: No, I didn't. I had used it about a day or two after this happened.

Q: So you are saying you used PCP after the shooting?

A: Yes, I did. I also—well, I had used to use about maybe for the last during '87, early '87, I had used it but I had stopped.

### B.

▆▆▆ The government's questioning of a defendant about his or her illegal drug use in front of the jury is a "highly inflammatory ... allegation," *United States v. Fowler*, 151 U.S.App.D.C. 79, 83, 465 F.2d 664, 668 (1972), which may "generate unwarranted prejudice" from the jury, *United States v. Sampol*, 204 U.S.App.D.C. 349, 395, 636 F.2d 621, 667 (1980), because of

"hostility based on the general odium of narcotics use," *United States v. Kearney*, 136 U.S.App.D.C. 328, 332, 420 F.2d 170, 174 (1969). Because evidence of a defendant's drug use is so prejudicial, such evidence is only admissible for specifically circumscribed purposes. Under no circumstances may evidence of a defendant's drug use be introduced as a general attack on credibility. *See United States v. Leonard*, 161 U.S.App.D.C. 36, 52, 494 F.2d 955, 971 (1974), *cited with approval in Durant v. United States*, 551 A.2d 1318, 1326 (D.C. 1988).

▇▇▇ Evidence of a defendant's drug use is admissible when the government has established that it is relevant to the defendant's recollection or perception of events surrounding the crime. *See Durant*, 551 A.2d at 1326–27. Under this rationale, however, the government may cross-examine a defendant regarding his or her drug use only after it first establishes an evidentiary foundation that the defendant was using drugs "at the time of the incident." *Rogers v. United States*, 419 A.2d 977, 981 (D.C.1980); *see Durant*, 551 A.2d at 1326–28; *cf. Smith v. United States*, 315 A.2d 163, 168 (D.C.) (trial court did not err in excluding expert testimony regarding effect of drug on ability to see because party attempting to introduce testimony failed to establish witness had been under influence of drug on day in question), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).[10]

The government argues that its cross-examination of appellant concerning his drug test was admissible both to impeach appellant's recollection and perception of events and to prove appellant's behavior and state of mind at the time he killed Harris, *i.e.*, to show that he was on PCP at the time of the incident and that he was as likely as Harris to have been the aggressor. In this way, the government hoped to neutralize appellant's theory of self-defense based in part on the medical evidence that Harris had PCP in his bloodstream at the time of death. As the prosecutor put it in his closing argument:

> So, ladies and gentlemen, what we have in the PCP arena is a wash. There is nothing that you can conclude from that evidence that tells you really anything about Lionel Harris' behavior, or I submit that tells you anything about Mr. Lyons' behavior on that night.

Both appellant and the government point us to *Durant* for guidance. In *Durant*, the government proffered a lab report indicating the detection of an unspecified amount of PCP in the defendant's urine on the day after the offense, along with evidence that the defendant had acted in a "bizarre" manner immediately after the incident. 551 A.2d at 1321, 1327. The trial judge allowed the government to cross-examine the defendant on his use of PCP "for the purpose of testing his ability to remember the events surrounding the charged offense [assault with intent to rob]." *Id.* at 1321. In ascertaining the correct evidentiary principle to apply, this court reasoned that, although it would be permissible for the government to offer extrinsic evidence of a drug test to impeach a defendant's denial of being under the influence of drugs at the time of the offense, the government must first establish a sufficient evidentiary foundation that the defendant was in fact under the influence of drugs at the relevant time. *See id.* at 1326 (citing *Rogers*, 419 A.2d at 981). We reversed in *Durant*, concluding that

> the government's proffer of lab reports indicating an unspecified quantity of PCP in [defendant's] urine and no PCP in

---

**10.** Evidence of a defendant's use or involvement with illegal drugs may also be admissible if the government first establishes that such evidence is directly linked to a defendant's behavior or state of mind relevant to an element of the crime charged, or meets an "other crimes" exception under *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85, 90 (1964). *See, e.g., Thompson v. United States*, 546 A.2d 414, 427–28 (D.C.1988) (reversible error to admit evidence of defendant's prior sale of PCP-laced marijuana to show intent to distribute because there was no evidence linking previous criminal act to crime charged and because intent was not a contested issue). *See generally id.* at 418–24 (discussing limited use of other crimes evidence of prior drug sale under intent exception of *Drew*). Neither appellant nor the government briefed or argued the applicability of *Drew* to this case.

his bloodstream was inadequate, in view of [defendant's] unrebutted proffer and his denial of use on the date of the offense, to establish that [defendant] was under the influence of PCP at the time of the offense. *See United States v. Leonard,* 161 U.S.App.D.C. 36, 52, 494 F.2d 955, 971 (1974). Hence, the evidence of his PCP use at some undetermined time prior to the events in question was not probative of impaired perception and memory and did not provide a sufficient evidentiary foundation for use as extrinsic impeachment evidence. *Id.*

The government argues that *Durant* is different from this case because, in *Durant,* the issue was strictly impeachment of the defendant's memory and perception with extrinsic evidence, while here the prosecutor never introduced the positive urine test. We find the government's logic unpersuasive. The prejudice—as the trial court recognized in this case—was that the jury found out about appellant's illegal drug use and therefore might have drawn an impermissible inference that appellant was a "bad" person who probably committed the crime or was lying about it. *Cf. Thompson v. United States,* 546 A.2d 414, 424 (D.C.1988) (explaining that danger of "other crimes" evidence is that it may prejudice jury against defendant). That the jury learned of appellant's PCP use through his own testimony on cross-examination rather than through extrinsic evidence is a distinction without meaning in this case.

▮▮▮ The government also argues that the drug test, along with Dr. Janofsky's testimony that someone whose urine tests positive for PCP could have used the drug anywhere up to two weeks before the test, provide a sufficient evidentiary foundation

under *Durant* to allow the prosecutor's questioning of appellant about his positive drug test. We disagree. The test under *Durant* is whether the government has proffered a sufficient evidentiary foundation that the defendant was "in fact under the influence of drugs at the relevant time." *Durant,* 551 A.2d at 1326. Dr. Janofsky's general statement and the positive urine test five days after the shooting do not tend to show that appellant was "in fact under the influence of drugs" when he shot and killed Harris. The jury could only speculate whether appellant had ingested the PCP eight days before, one day before, or three days after the incident, and would have to further speculate as to the effect the PCP might have had—if ingested before the shooting—on appellant's behavior at the relevant time.[11]

In sum,

we are persuaded that the evidence adduced by the government [expert's general statement that PCP stays in the urine up to two weeks and appellant's positive urine test for PCP several days after the incident] provided too slim a reed to support a conclusion that [appellant] was under the influence of PCP at the time of those events, or had consumed PCP at such time as it would have been reasonable for the jury to infer that the PCP was affecting [appellant's] *behavior* or ability to perceive and recall events.

*Durant,* 551 A.2d at 1328 (emphasis added). The trial court erred in allowing the government to question appellant about the drug test.

**IV.**

Appellant next argues that the trial court erred when it allowed the testimony of

---

11. This speculation contrasts with the defense evidence that Harris had PCP in his bloodstream at the time of death coupled with Dr. Janofsky's expert testimony that PCP in the bloodstream affects behavior, although in unpredictable ways. That evidence established a sufficient foundation that Harris "in fact was under the influence of drugs at the relevant time." *Durant,* 551 A.2d at 1326; *cf. Coates v. United States,* 558 A.2d 1148, 1152 (D.C.1989)

(upholding trial court's ruling that otherwise qualified expert was unqualified to testify regarding PCP's effects on witness because expert had no particular knowledge of witness's drug use). A properly instructed jury can consider such evidence. We note that in this case neither side suggested or requested a jury instruction on the evidence of PCP usage by either Harris or appellant.

Officer Roy Brown under the exception to the hearsay rule known, alternatively, as excited utterance, spontaneous utterance, or spontaneous exclamation. Using three pages of his own notes he wrote months after he had spoken with Jones, Officer Brown recounted in 685 words a statement he testified Kent Jones had made to him just after the shooting.[12]

 What constitutes a spontaneous utterance depends on the particular facts of each case. *Price v. United States*, 545 A.2d 1219, 1225–26 (D.C.1988). There are, however, three requirements for admission of an out-of-court statement under this exception to the hearsay rule:

(1) the occurrence of a startling event which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant did not reflect upon the event and possibly fabricate [or premeditate] a statement, and (3) circumstances, which in their totality suggest spontaneity and sincerity of the remark.

**12.** In response to the prosecutor's question "Would you please start where you had left off regarding what Kent Jones told you about that night," Officer Brown gave the following narrative, interrupted only twice by the prosecutor:

Okay, sir. He told me that him and the decedent were inside a record store just down the street and he recognized—Mr. Jones recognized a young lady as a prior acquaintance. Apparently, they were in junior high school together, something of that nature, and he approached her and began small talk with her, hello, don't you remember me, things like that and he told me that while he was speaking with her, there was another person, a subject who was apparently later he realized was with the young lady was standing in the store at some distance and gave what he described to him as dirty looks.

Well, the conversation lasted a short time and the decedent had apparently seen the subject, the girl and Mr. Jones and he walked up to Mr. Jones and asked if he knew the girl and he said yeah, I recognized her from a school he went to and Mr. Jones said to the decedent, let's get out of here. So, they went on out front to the sidewalk and they were standing outside the door when the subject came out and gave to Mr. Jones what he called dirty looks and walked up and down the front of the store looking at him.

At that point, they decided to go back to the parking lot to get in the car and leave. They walked up to the parking lot and as they were preparing to enter the car, the subject and the girl also walked northbound through the lot and Mr. Jones said that he overheard several things said by the girl as they walked by. [Prosecutor's question: Did he say to whom the girl was speaking?]

The girl was speaking to the subject she was with. I can't recall the exact quotation I have in my notes. I can try as best I can with my memory.

[Prosecutor's comment: Please do it from what you can testify from your memory.]

The best as I can recall by memory was when they were walking by, he had heard her or overheard her saying to the subject no, don't, don't, no. And as they walked up by the car, statements of that nature continued.

At that point when they arrived at the subject's car, he entered the driver's side and removed something shiny from somewhere in the front floor area of the driver's side and put it in the waistband area of his pants. At that point, he heard the girl shouting no, don't, come back, don't. At that point, the subject walked down southbound through the lot again and approached the car where Mr. Jones and the decedent were. Now, Mr. Jones told me from what he saw with the guy taking something out from under the front seat of the car, he was scared and he said he didn't get in the car right away. He kept his eyes on the subject and when the subject approached Mr. Jones first, he said he was standing, he said, about 12 feet away or somewhere in that vicinity and the guy yelled, you don't know her, you don't know her, and he pulled something out of his waistband which he found shortly thereafter was a gun and the subject took a shot at him.

Now, he told me that he'd just dove down on the floor alongside the car. Apparently the subject, the distance he was, it was at an angle and he was on the other side towards the driver of the car and Mr. Jones ducked down and he said he played dead for a few seconds. So, at that point, he said the subject went over to the driver who was the decedent and he said that his door wasn't shut yet. He might have had one leg out and the altercation began where the subject was striking the decedent. He said at that point, he got scared and he ran and that's when he heard a shot and when he related this to me, he started crying and sobbing uncontrollably and again, as he said was stated to me to the fact it was my fault, it should have been me and that he was going to go somewhere. He was going to go to school, he was going to be somebody. The exact quote, I don't remember, was he didn't do the shit that other people did. He was okay and that's about where my statement ended there.

*Id.* at 1226 (quotations omitted); *accord Alston v. United States,* 462 A.2d 1122, 1126–27 (D.C.1983); *Nicholson v. United States,* 368 A.2d 561, 564 (D.C.1977). If any of these three requirements is not met, an out-of-court statement does not have sufficient reliability for admission as an exception to the hearsay rule. The ultimate question, therefore, is whether the statement, as reported at trial,[13] was "a spontaneous reaction to the exciting event" rather than "the result of reflective thought." E. CLEARY, MCCORMICK ON EVIDENCE, § 297 at 856 (3d ed. 1984), *cited with approval in Price,* 545 A.2d at 1227.

*Nicholson* provides a classic example of an out-of-court statement that meets the requirements of spontaneity. Someone asked the victim of a stabbing what had happened. Her last statement before dying—as repeated at trial—consisted of three words which, according to the government, identified her assailant: "Irene, Irene, Irene." 368 A.2d at 564. As another example, In *James v. United States,* 580 A.2d 636 (D.C.1990), this court remanded for the trial court to revisit its evidentiary ruling as to whether the declarant's four word statement, "Keith shot at Ben," was spontaneous in light of the declarant's earlier statements. *Id.* at 645–46.

In *Price,* the declarant was the defendant's girlfriend, who, shortly after the victim had been shot by the defendant, spoke with the victim's brother on the telephone. In response to his questioning, the defendant's girlfriend kept repeating, "I didn't know he was going to do that" and gave the name of the defendant as the shooter. 545 A.2d at 1221. In *Young v. United States,* 391 A.2d 248, 250 (D.C. 1978), the decedent had stated to police officers on the scene of his stabbing that "Big Junior" had stabbed him and had asked an officer to "Give me your gun and I'll go get him" and to "Just bandage me up so I can go and kill him." This court concluded that the declarant's statements "were not made under the impetus of reflection." *Id.*

In contrast to the above cited cases and others we have examined, in this case Officer Brown did not just repeat discrete words or sentences uttered by the declarant. Instead, the officer related in his own words all the information Jones gave him during the officer's interview of Jones about the incident. In so doing, Officer Brown—relying on three pages of his own notes—gave a detailed blow-by-blow chronological narrative of Jones's account of events from the moment Jones and Harris entered the record store through Jones's reaction after the shooting. Although we do not question the officer's good motives in trying to reconstruct as accurately as possible Jones's statement to him, the officer's testimony is in fact his own account of what Jones told him during a lengthy police interview.

Such an elastic use of the spontaneous utterance exception would swallow the rule against out-of-court statements anytime the police interview an upset witness to a startling event. Although the exception allows the police to repeat discrete statements by an eyewitness, it does not permit the police to state on the stand what is, in effect, an independent account of the declarant's testimony at trial.

We conclude that the officer's 685–word report of his interview with Jones was not the in-court repeating of a declarant's "remark," *Price,* 545 A.2d at 1226, constituting a "spontaneous reaction to the exciting event." E. CLEARY, MCCORMICK ON EVIDENCE, § 297 at 856. The totality of the circumstances—including the chronological narrative form of Officer Brown's in-court report of Jones's lengthy statement to the police—show a lack of spontaneity. *See Nicholson,* 368 A.2d at 564. We therefore conclude that the trial court's decision to admit Jones's declaration through Officer Brown's testimony was clearly erroneous.

---

13. The trial court in this case applied the three requirements *before* Officer Brown reported the 685 word "spontaneous" utterance. Defense counsel, however, had warned the court that the utterance would be merely a repetition of what Kent Jones had said on direct. Furthermore, the prosecutor had informed the court that Kent Jones's statement to the officer had been ten to fifteen minutes in length.

## V.

■ Having found the trial court erred in making two discretionary evidentiary rulings, *see* Parts III. and IV. above, we now ask whether the two errors combined are "of a magnitude to require reversal." *Johnson v. United States,* 398 A.2d 354, 366 (D.C.1979) (italics omitted). In so do-.ing, we "weigh the severity of the error[s] against the importance of the determina-tion[s] in the whole proceeding and the possibility for prejudice as a result." *Id.* at 367. We conclude that the errors had "a possibly substantial impact upon the out-come," *id.* at 366, requiring reversal.

First, the trial court's error in allowing the government to question appellant about his positive urine test for PCP placed him in a no-win situation. On the one hand, if he had denied the drug test, the trial court would have allowed the government to im-peach his veracity with the lab report. On the other hand, because he admitted he had used PCP, the jury heard both the govern-ment's accusatory question and appellant's own admission that he had used illegal drugs close to the time he shot and killed Harris. As the trial court observed, "there is certainly prejudicial impact" when the government questions a defendant about his or her drug use in front of the jury.

The court's ruling also opened the door for the prosecutor to go one step further in closing argument by telling the jurors that it was up to them to decide whether appel-lant had been under the influence of PCP at the time of the shooting:

> You also know that Lewis Lyons, when he was arrested four or five days later, he had PCP in his system, too. Now, of course, Mr. Lyons was able to get on the stand and testify that he did not use that before this crime occurred, that he used it after the crime occurred. But, I sub-mit to you that is something for you to decide.
>
> If you decide—you can decide whether or not Mr. Lyons is telling you the truth about that, and if he had used it before the event, do you think he would get up on the witness stand and tell you that he

was under the influence of PCP when this crime occurred?

> So what you got is evidence of both people [appellant and the deceased] hav-ing PCP in their systems at a time that is very close to when this occurred. And you know what? That doesn't tell you anything. . . .
>
> So, ladies and gentlemen, what we have in the PCP arena is a wash.

Because the government did not estab-lish that PCP was in fact in appellant's system at the time of the shooting, it was not entitled to that "wash." Thus, the trial court's error allowed the government to neutralize by unfair means an important part of appellant's self-defense theory: his claim that Harris was the aggressor, sup-ported by the toxicology report showing that Harris had PCP in his bloodstream at the time of death and Dr. Janofsky's expert testimony explaining that evidence. *See supra* note 9. Moreover, the court's error allowed the jury to misuse the expert's testimony about the effects of PCP in as-sessing appellant's own behavior, without probative evidence that appellant was un-der the influence of PCP at the time of the shooting.

Second, as a result of the trial court's error in permitting the government to in-troduce Officer Brown's testimony report-ing Kent Jones's account of what happened under the spontaneous utterance exception to the hearsay rule, the prosecutor was able to highlight the officer's testimony in his closing argument:

> Equally as important as what Ivan [Whitey] Jones said to corroborate Kent Jones is Officer Roy Brown. Ladies and gentlemen, you heard Officer Brown tes-tify as to what Kent Jones told him in his cruiser that same night within half an hour, an hour at the most, of when the shooting occurred, of what Kent Jones told him after Kent Jones had come back to the scene and seen his close friend dying, bleeding on the sidewalk.
>
> Ladies and gentlemen, that corrobo-rates Kent Jones because it tells you that what he told you up here on the witness

stand was exactly what he told the police right there on the scene....

....

Doesn't that provide important corroboration for Kent Jones? Doesn't that tell you that what he has told you on the witness stand is telling you the truth?

Thus, the prosecutor effectively used Officer Brown's 685–word account of what Jones told him as a prior consistent statement both to bolster Jones's credibility and to corroborate Jones's testimony.

As the above-quoted portions of the prosecutor's closing argument reveal, evidence of appellant's positive urine test for PCP and Officer Brown's testimony about what Kent Jones had said were fundamental components of the government's case. Because that evidence went to the heart of the credibility contest between appellant and Jones—the only witnesses who testified as to what happened in the struggle between appellant and Harris—it was critical to the jury's decision. We therefore conclude that the trial court's errors "jeopardized the fairness of the proceeding as a whole." *Johnson*, 398 A.2d at 366. Accordingly, we reverse and remand for a new trial.

### *Reversed and remanded.*

WAGNER, Associate Judge, concurring in part and dissenting in part:

I concur in the decision of the court reversing appellant's convictions for the reasons set forth in Parts III. through V. of the opinion. However, I respectfully dissent from Part II.A. of the opinion. In my view, the use of an accused's non-custodial silence as evidence is not restricted to a material omission from what purports to be a complete account of what happened. Rather, an accused's complete silence may also be admitted as evidence where he or she fails to assert a fact under other circumstances where it would have been natural to do so. *Jenkins v. Anderson*, 447 U.S. 231, 238–39, 100 S.Ct. 2124, 2129, 65

L.Ed.2d 86 (1980); *Tucker v. Francis*, 723 F.2d 1504, 1510–11 (11th Cir.1984); *State v. Brown*, 118 N.J. 595, 613–14, 573 A.2d 886, 895 (1990); *Skipper v. Commonwealth*, 195 Va. 870, 875–76, 80 S.E.2d 401, 404 (1954); *see also United States v. Kilbourne*, 559 F.2d 1263, 1265 (4th Cir.), *cert. denied*, 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 152 (1977); *United States v. Hoosier*, 542 F.2d 687, 688 (6th Cir.1976). Under this generally recognized principle, such evidence is considered "an assertion of the non-existence of the fact" and is regarded *prima facie* as an inconsistency. *Skipper*, 195 Va. at 875, 80 S.E.2d at 404 (citing WIGMORE ON EVIDENCE § 1042 at 733 (3d ed.)). This court has sanctioned the admissibility of such evidence as probative on the issue of credibility, *inter alia. Ester v. United States*, 253 A.2d 537, 538 (D.C.1969). In *Ester*, the appellant claimed at trial that he witnessed, rather than participated in, an assault and that he was only running after the assailant when he was mistakenly identified as the perpetrator. *Id.* We upheld the trial court's decision allowing the prosecutor to question Ester and to argue later about Ester's failure to wait and tell the police prior to arrest that he only witnessed the assault. *Id.*

A threshold requirement for admissibility in the case of complete silence, as it is with our precedents governing the admissibility of material omissions,[1] is whether it can be inferred that a reasonable person similarly situated would have come forward naturally with a statement or response. *Brown*, *supra*, 573 A.2d at 895. In my opinion, that question must be answered in the affirmative in this case. Here, there was every reason for one in appellant's position to offer an exculpatory, self-defense explanation to his companions that night when one of them asked him what happened. Appellant had just returned to the car following the shooting with a gun which purportedly he did not have before the shooting. It was then that appellant's girlfriend

---

1. *See Ford v. United States*, 487 A.2d 580, 587 (D.C.1984); *Beale v. United States*, 465 A.2d 796, 804–05 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *Hill v.* *United States*, 404 A.2d 525, 532 (D.C.1979) (per curiam), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980); *Sampson v. United States*, 407 A.2d 574, 576–77 (D.C.1979).

of six years first asked appellant, in the presence of another trusted friend, what happened. Moreover, both of appellant's companions were material witnesses upon whom he would be expected to rely to support his version of the events that night. Under the circumstances, it would have been natural for appellant to share his self-defense claim with them when his girl-friend asked what happened. Whatever reason appellant might have had for not doing so does not affect the admissibility of the evidence. Of course, an accused is at liberty to offer such explanations at trial. *Skipper, supra,* 195 Va. at 876, 80 S.E.2d at 404; *see also Allen v. United States,* 603 A.2d 1219, 1223 & n. 6 (D.C.1992) (en banc).[2] It is then appropriately left to the jury to determine the plausibility of the subsequently disclosed self-defense claim in light of appellant's conduct immediately after the shooting and any evidence offered in explanation of it. *See id.* at 1222–23.[3] For the foregoing reasons, in my view, all the requirements for admissibility were met, and the inferences to be drawn from that evidence were appropriate for consideration by the jury.

---

**2.** In *Allen,* the prosecutor sought to show that if appellant killed the victim in self-defense, it would have been logical for him to do certain things he had not done, including "telling his sister and brother-in-law about [the victim's] death." 603 A.2d at 1222. The majority agreed with the trial court that "the prosecutor was asking the jury to draw reasonable inferences from [appellant's] conduct at a time when actions spoke louder than words," and found no error in the cross examination and argument. *Id.* at 1223. In that respect *Allen* is quite comparable to the case before the court. Other lines of cross-examination about Allen's pre-arrest conduct, including his failure to preserve evidence, were also at issue. *Id.* at 1222–23. The majority concluded that Allen had the opportunity to offer explanations for his failure to act in a particular way right after the incident, in view of his claim of self-defense at trial, and that the plausibility of such explanations were

better left to the jury for determination. *Id.* at 1223 & n. 6.

**3.** *See* note 2, *supra.* Other holdings of this court in similar contexts also support this approach. *See e.g., Hunter v. United States,* 606 A.2d 139, 147–48 (D.C.1992); *Dixon v. United States,* 565 A.2d 72, 80 n. 15 (D.C.1989). For the reasons stated above, I disagree with the majority that the principles distilled from these cases are inapplicable simply because at issue here is appellant's silence (when it can reasonably be inferred that one would speak), rather than an omission from a statement. Further, in my view, there is no reason for the jury not to be permitted to assess otherwise properly admissible evidence of pretrial silence simply because that silence followed questioning by a friend rather than by a law enforcement officer, as the majority seems to suggest in an effort to distinguish these cases.